# No. 22-2859

In The

United States Court of Appeals

for the Second Circuit

NOSTALGIC PARTNERS, LLC, d/b/a THE STATEN ISLAND YANKEES; ONEONTA ATHLETIC CORPORATION, d/b/a THE NORWICH SEA UNICORNS; and TRI-CITY VALLEYCATS, INC.,

*Plaintiffs-Appellants*,

SPORTS ENTERPRISES, INC., d/b/a SALEM-KEIZER VOLCANOES

*Plaintiff,*

v.

THE OFFICE OF THE COMMISSIONER OF BASEBALL, AN UNINCORPORATED ASSOCIATION d/b/a MAJOR LEAGUE BASEBALL

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Southern District of New York
21-cv-10876 (Hon. Andrew L. Carter, Jr.)

**BRIEF FOR THE UNITED STATES OF AMERICA AS AMICUS CURIAE IN SUPPORT OF NEITHER PARTY**

JONATHAN S. KANTER
   *Assistant Attorney General*

DOHA G. MEKKI
   *Principal Deputy Assistant Attorney General*

MAGGIE GOODLANDER
   *Deputy Assistant Attorney General*

DAVID B. LAWRENCE
   *Policy Director*

ERIC D. DUNN
   *Counsel to the Assistant Attorney General*

DANIEL S. GUARNERA
JACOBUS P. VAN DER VEN
   *Attorneys*

DANIEL E. HAAR
NICKOLAI G. LEVIN
MATTHEW C. MANDELBERG
   *Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave., NW,
Room 3224
Washington, DC 20530-0001
(202) 476-0483
matthew.mandelberg@usdoj.gov

*Counsel for the United States*

i

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. ii
INTEREST OF THE UNITED STATES ............................................................. 1
BACKGROUND .................................................................................................... 2
ARGUMENT
    THE *FEDERAL BASEBALL* EXEMPTION IS "OF DUBIOUS VALIDITY" AND SHOULD
    NOT BE EXTENDED .................................................................................... 6
CERTIFICATE OF COMPLIANCE ................................................................ 14

## TABLE OF AUTHORITIES

**Cases** Page(s)

*Amateur Softball Ass'n of America v. United States*,
    467 F.2d 312 (10th Cir. 1972)..................................................................... 11

*American Needle, Inc. v. NFL*,
    560 U.S. 183 (2010).............................................................................1, 2, 12

*Boston Professional Hockey Ass'n v. Cheevers*,
    348 F. Supp. 261 (D. Mass. 1972).............................................................. 11

*Brown v. Pro Football, Inc.*,
    518 U.S. 231 (1996)............................................................................. 11, 12

*Butterworth v. National League of Professional Baseball Clubs*,
    644 So. 2d 1021 (Fla. 1994) ......................................................................... 7

*Federal Maritime Commission v. Seatrain Lines, Inc.*,
    411 U.S. 726 (1973)...................................................................................... 8

*Federal Baseball Club of Baltimore v. National League of Professional Baseball Clubs*,
    259 U.S. 200 (1922).............................................................................6, 7, 9

*Flood v. Kuhn*,
    407 U.S. 258 (1972)............................................................................passim

*FTC v. Phoebe Putney Health System, Inc.*,
    568 U.S. 216 (2013).................................................................................... 11

*FTC v. Ticor Title Insurance Co.*,
    504 U.S. 621 (1992).................................................................................... 10

*Gardella v. Chandler*,
    172 F.2d 402 (2d Cir. 1949) ......................................................................... 9

*Group Life & Health Insurance Co. v. Royal Drug Co.*,
    440 U.S. 205 (1979)...................................................................................... 8

*Haywood v. National Basketball Ass'n*,
    401 U.S. 1204 (1971) ................................................................................. 11

*Henderson Broadcasting Corp. v. Houston Sports Ass'n, Inc.*,
   541 F. Supp. 263 (S.D. Tex. 1982) ............................................................. 7, 8

*Laumann v. National Hockey League*,
   56 F. Supp. 3d 280 (S.D.N.Y. 2014) ............................................................... 7

*NCAA v. Alston*,
   141 S. Ct. 2141 (2021) ........................................................................... passim

*Parker v. Brown*,
   317 U.S. 341 (1943) ......................................................................................... 10

*Piazza v. Major League Baseball*,
   831 F. Supp. 420 (E.D. Pa. 1993) .................................................................. 7

*Pirone v. MacMillan, Inc.*,
   894 F.2d 579 (2d Cir. 1990) ............................................................................ 2

*Radovich v. National Football League*,
   352 U.S. 445 (1957) ........................................................................ 7, 8, 9, 11

*Right Field Rooftops, LLC v. Chicago Cubs Baseball Club, LLC*,
   870 F.3d 682 (7th Cir. 2017) .......................................................................... 7

*Salerno v. American League of Professional Baseball Clubs*,
   429 F.2d 1003 (2d Cir. 1970) ......................................................................... 9

*SEC v. National Securities, Inc.*,
   393 U.S. 453 (1969) ......................................................................................... 8

*Toolson v. New York Yankees, Inc.*,
   346 U.S. 356 (1953) ......................................................................................... 7

*United States v. International Boxing Club*,
   348 U.S. 236 (1955) ....................................................................................... 11

**Statutes**

15 U.S.C. § 15 ......................................................................................................... 6

15 U.S.C. §§ 1291-95 .......................................................................................... 12

**Legislative Materials**

H.R. Res. 815, 116th Cong. (2020) ................................................................................ 3

**Rules**

Federal Rule of Appellate Procedure 29(a)(2) ................................................................ 1

**Other Authorities**

Nola Agha, *The Economic Impact of Stadiums and Teams: The Case of Minor League Baseball*,
14 J. Sports Econ. 227 (2013) .................................................................................. 2, 3

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust
Principles and Their Application (4th ed. 2022) ........................................................ 12

MLB.TV Help Center, Can I access my subscription from any computer, anywhere, at
anytime? (last accessed Jan. 26, 2023) .................................................................... 10

Mike Ozanian & Justin Teitelbaum, *Baseball's Most Valuable Teams 2022*, Forbes (Mar.
24, 2022) ................................................................................................................... 2

## INTEREST OF THE UNITED STATES

The United States enforces the federal antitrust laws, including Section 1 of the Sherman Act, and has a strong interest in their reach and correct application. That is particularly true where parties seek special treatment under the antitrust laws, as Defendant does here.[1]

The United States has previously filed amicus briefs addressing the enforcement of the antitrust laws in the context of professional sports leagues, including in this case before the District Court.[2] We file this brief under Federal Rule of Appellate Procedure 29(a)(2).

---

[1] *See, e.g.*, En Banc Brief for the United States and the Federal Trade Commission as Amici Curiae Supporting Plaintiff-Appellee, *SmileDirectClub v. Battle*, 4 F.4th 1274 (11th Cir. 2021), https://www.justice.gov/atr/case-document/file/1369006/download (addressing an implied exemption to the antitrust laws for certain state actions).

[2] *See* Statement of Interest of the U.S., Dkt. 35 (June 15, 2022); *see also* Brief for the United States as Amicus Curiae Supporting Respondents, *NCAA v. Alston*, 141 S. Ct. 2141 (2021), https://www.justice.gov/atr/case-document/file/1376116/download; Brief for the United States as Amicus Curiae in Support of Neither Party, *Relevent Sports v. FIFA*, No. 21-2088, 2020 WL 4194962 (2d Cir. Oct. 14, 2021), https://www.justice.gov/atr/case-document/file/1442196/download; Brief for the United States as Amicus Curiae in Support of Neither Party, *City of Oakland v. Oakland Raiders*, 20 F.4th 441 (9th Cir. 2021), https://www.justice.gov/atr/case-document/file/1328216/download; Brief for the United States as Amicus Curiae Supporting Petitioner, *American Needle, Inc. v. NFL*, 560 U.S. 183 (2010), https://www.justice.gov/atr/case-document/file/485906/download.

1

## BACKGROUND

Baseball is America's "National Pastime" and has, over the course of nearly two centuries, "become a part of the national character." *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 580 (2d Cir. 1990). Major League Baseball is also big business. The average Major League Baseball team is worth over $2 billion dollars, up 9 percent since 2021.[3] Major League teams compete not just to win championships, but also to attract fans and earn revenue. Compl. ¶¶ 76-79; *see also Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 196-97 (2010) ("[T]eams compete with one another, not only on the playing field, but to attract fans, for gate receipts, and for contracts with managerial and playing personnel."). This competition can generate significant benefits for fans, players, and other trading partners, as it does elsewhere in the economy.

Likewise, Minor League Baseball enjoys a special place in American life. In communities across America, Minor League Baseball is a vital source of jobs, tourism, and affordable entertainment. For example, Plaintiffs estimate that the Tri-City Valley Cats, previously a Single-A affiliate of the Houston Astros, provided the city of Troy, New York with about "$55 million in beneficial economic impacts from one year of operations" and supported 763 local jobs. Compl. ¶ 73; *see also* Nola Agha, *The*

---

[3] Mike Ozanian & Justin Teitelbaum, *Baseball's Most Valuable Teams 2022*, Forbes (Mar. 24, 2022), https://www.forbes.com/sites/mikeozanian/%202022/03/24/baseballs-most-valuable-teams-2022-yankees-hit-6-billion-as-new-cba-creates-new-revenue-streams/.

2

*Economic Impact of Stadiums and Teams: The Case of Minor League Baseball*, 14 J. Sports Econ. 227, 227 (2013) (showing that the presence of a Minor League team is associated with "significant positive effects" on local per capita income in hundreds of communities across the country); H.R. Res. 815, 116th Cong. (2020) ("[T]he economic stimulus and development provided by Minor League Baseball clubs extends beyond the cities and towns where it is played, to wide and diverse geographic areas comprising 80 percent of the population in the Nation."). Eliminating Minor League teams can therefore have wide-ranging effects on fans, players, and communities throughout the United States.

From 1903 until 2020, the relationship between Major League teams and Minor League teams was governed by the Professional Baseball Agreement. Compl. ¶¶ 49-50, 60. Under this system, individual Major League teams competed to "affiliate" with individual Minor League teams, and individual Minor League teams competed for affiliations with individual Major League teams. *Id.* ¶¶ 49-53. Major League teams covered certain expenses for their Minor League affiliates in exchange for revenue sharing and talent development. *Id.* When the Professional Baseball Agreement expired in 2020, however, Defendant and the Major League teams "jointly agreed to implement a new minor league system" called the "Professional Development League," which changed both how many and which Minor League teams could affiliate. *Id.* ¶¶ 60-61; Def.'s Memorandum of Law in Support of its Mot. to Dismiss ("MTD"), Dkt. 27, at 5 (Apr. 22, 2022). Under the Professional Development

3

League, the total number of Minor League affiliates was reduced from 160 under the Professional Baseball Agreement (six per Major League team) to 120 (four per Major League team). Compl. ¶ 2; MTD 5. Moreover, Major League teams could not choose to affiliate with the 40 "Ousted Teams." *Id.* ¶ 60.

Plaintiffs are former affiliates of Major League teams. They allege that the Professional Development League involves a horizontal group boycott among Major League teams against the 40 Ousted Teams, including Plaintiffs, which can no longer compete to affiliate with Major League teams or even play against their affiliates. Compl. ¶ 111. Plaintiffs also allege that the Professional Development League involves a horizontal agreement among Major League teams "that has artificially reduced and capped output" of affiliations below the level "that would otherwise occur in an unconstrained market." *Id.* A Major League team can no longer choose to contract with a Minor League team, even if both wanted to do so. *Id.* ¶ 68. As a result of this agreement, Plaintiffs aver that "fans, sponsors, and communities" have been "deprived of the MLB-affiliated product that would have been offered to them if competition had not been restrained." *Id.* ¶ 73.

Without the MLB affiliation, Plaintiffs allege, the Ousted Teams will lose talented players that want the prospect of MLB advancement along with MLB players on rehabilitation assignments. *Id.* ¶¶ 69-72. Fans and sponsorships will likely follow this departing talent. *Id.* Plaintiffs seek damages, fees, and an injunction that would "permit [Major League] Clubs to compete with each other to make their own

4

decisions as to with which MiLB teams—and how many—to affiliate." *Id.* at 32 (Prayer for Relief).

Major League Baseball moved to dismiss on three grounds: lack of antitrust standing, failure to plead a Sherman Act violation, and the baseball exemption from the antitrust laws. MTD 1-3. Plaintiffs argued that "MLB's Motion should be granted as to the exemption and denied on all other grounds." Pls.' Opp'n to Def.'s Mot. to Dismiss, Dkt. 31, at 25 (May 27, 2022). Plaintiffs argued that Defendant's conduct would "brazenly violate[] the antitrust laws," but for the exemption, and they expressed their intent ultimately to ask the Supreme Court to overrule its precedents in this area. *Id.* at 1-2. The United States filed a Statement of Interest in the District Court. *See* Statement of Interest of the U.S., Dkt. 35 (June 15, 2022). The District Court granted the motion to dismiss pursuant to the baseball exemption, and this appeal followed.

5

## ARGUMENT

### THE *FEDERAL BASEBALL* EXEMPTION IS "OF DUBIOUS VALIDITY" AND SHOULD NOT BE EXTENDED

The baseball exemption was set forth in *Federal Baseball Club of Baltimore v. National League of Professional Baseball Clubs*, 259 U.S. 200 (1922), as a judicially-created exception to the Sherman Act. There, a rival baseball team filed suit under Section 4 of the Clayton Act (15 U.S.C. § 15) against the two dominant professional baseball leagues—predecessors to Major League Baseball's American and National leagues—alleging a conspiracy to "destroy[]" the upstart "Federal League" in violation of the Sherman Act. *Id.* at 207. The Supreme Court rejected these claims on the ground that the defendants' "business is giving exhibitions of base ball, which are purely state affairs." *Id.* at 208. Although the Court acknowledged that these "exhibitions" required "repeated travelling on the part of the clubs" across state lines, it concluded that this travel was "not enough to change the character of the business" because it was "a mere incident" to otherwise intrastate exhibitions. *Id* at 208-09. It held that baseball was not sufficiently involved in interstate commerce to be subject to the Sherman Act. *Id.*

In *Federal Baseball*, the Court identified "[t]he business" at issue as "giving exhibitions of base ball." *Id.* at 208. The distinction the Court drew between exhibitions (games, "the essential thing") and activity that was "mere incident" to the exhibitions—such as the teams' travel—was core to its Commerce Clause reasoning.

6

*Id.* at 209. In *Toolson v. New York Yankees, Inc.*, 346 U.S. 356 (1953) (per curiam), the Court characterized the scope of *Federal Baseball*'s holding as concerning "the business of *providing public baseball games for profit* between clubs of professional baseball players." *Id.* at 357 (emphasis added). And in *Flood v. Kuhn*, 407 U.S. 258 (1972), the Court merely "adhere[d]" to these cases. *Id.* at 284. It did so notwithstanding the Court's own observation in *Radovich v. Nat'l Football League*, 352 U.S. 445 (1957), that the *Federal Baseball* ruling "at best was of dubious validity." *Id.* at 450.

There remains disagreement on the scope of the exemption. Some courts have concluded that the *Federal Baseball* exemption is limited to a term in player contracts—the reserve clause—which MLB largely abandoned in 1975, effectively leaving the exemption a nullity. *See Piazza v. Major League Baseball*, 831 F. Supp. 420, 438 (E.D. Pa. 1993); *Butterworth v. Nat'l League of Prof'l Baseball Clubs*, 644 So. 2d 1021, 1024 (Fla. 1994) (similar). Other courts have construed the exemption broadly. In *Right Field Rooftops, LLC v. Chicago Cubs Baseball Club, LLC*, 870 F.3d 682 (7th Cir. 2017), for example, the Seventh Circuit exempted the Chicago Cubs' attempt to set minimum prices for seating on rooftops adjacent to Wrigley Field on the grounds that adjacent rooftop pricing was "part and parcel" of "providing public baseball games for profit." *Id.* at 689. In addition, as the United States argued in the district court, other courts have held that only conduct "central to the business of baseball" is covered by the *Federal Baseball* exemption. *See Laumann v. Nat'l Hockey League*, 56 F. Supp. 3d 280, 297 (S.D.N.Y. 2014); *Henderson Broad. Corp. v. Houston Sports Ass'n, Inc.*, 541 F. Supp. 263,

7

265 (S.D. Tex. 1982). This limited reading of the exemption is more consistent with the Supreme Court's guidance to "strictly construe[]" exemptions from the antitrust laws. *Fed. Mar. Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 733 (1973); *Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 231 (1979); *see also SEC v. National Securities, Inc.*, 393 U.S. 453, 460 (1969) (explaining that an exemption for the "business of insurance" reaches only "core" aspects of the relationship between an insurance company and a policy holder, not every kind of agreement between an insurance company and any of its trading partners).

In this case, the Court need not resolve the exemption's precise contours because plaintiffs have conceded that the conduct they allege falls within the scope of the *Federal Baseball* exemption. Br. for Pls.-Apps., Dkt. 60, at 37 (Jan. 9, 2023) ("Plaintiffs acknowledge that these precedents . . . presently immunize MLB for the anticompetitive conduct that injured Plaintiffs."). The United States therefore does not take a position on whether the exemption applies here. Instead, the United States files this brief to reaffirm, as the Supreme Court has said, that courts should "'not extend'" the *Federal Baseball* exemption. *Flood*, 407 U.S. at 279 (quoting *Radovich*, 352 U.S. at 451).

The Supreme Court has repeatedly "acknowledged criticisms of the [*Federal Baseball*] decision as 'unrealistic' and inconsistent' and 'abberation[al].'" *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2159 (2021) (quoting *Flood*, 407 U.S. at 282 and *Radovich*, 352 U.S. at 452). In *Alston*, the unanimous Court said *Federal Baseball*

8

"reasoned that 'exhibitions' of 'base ball' did not implicate the Sherman Act because they did not involve interstate trade or commerce—even though teams regularly crossed state lines (as they do today) to make money and enhance their commercial success." *Id.* (quoting *Federal Baseball*, 259 U.S. at 208-09). The Court then emphasized that *Federal Baseball*'s reasoning should not be extended to the NCAA or "other sports leagues." *Id.* *Flood* likewise noted that *Federal Baseball*'s reasoning was inconsistent with "the Court's expanding concept of interstate commerce" because "[p]rofessional baseball is a business and it is engaged in interstate commerce." 407 U.S. at 282. And in *Radovich*, the Supreme Court also said *Federal Baseball*'s reasoning "at best was of dubious validity" and "were we considering the question of baseball for the first time upon a clean slate" the Court would have decided the case differently. 352 U.S. at 450, 452.

This Court has recognized that, "to use the Supreme Court's own adjectives," *Federal Baseball* was "'unrealistic,' 'inconsistent,' and 'illogical.'" *Salerno v. Am. League of Prof'l Baseball Clubs*, 429 F.2d 1003, 1005 (2d Cir. 1970) (quoting *Radovich*, 352 U.S. at 452). This Court has added its own adjectives as well, characterizing the rationale of the baseball exemption as "extremely dubious," noting its factual moorings "have all but vanished," and calling its creation "not one of Mr. Justice Holmes' happiest days." *Id.* But it left the "pronouncement of . . . doom" for *Federal Baseball* to the Supreme Court given its "exclusive privilege of overruling its own decisions." *Id.* at 1005; *see also Gardella v. Chandler*, 172 F.2d 402, 408-09 (2d Cir. 1949) (Frank, J., concurring)

9

("No one can treat as frivolous the argument that the Supreme Court's recent decisions have completely destroyed the vitality of [*Federal Baseball*] decided twenty-seven years ago, and have left that case but an impotent zombi.").

In addition to acknowledging criticisms of *Federal Baseball*, the Supreme Court has also noted that relevant market realities had changed dramatically in the half century since *Federal Baseball* in light of, among other things, the "advent of radio and television, with their consequent increased coverage and additional revenues." *Flood*, 407 U.S. at 283. More than a century since *Federal Baseball*, changed market realities are even more dramatic. Baseball is a multi-billion-dollar business in which games can be streamed "from any computer, anywhere, at anytime."[4] In the succinct words of the Supreme Court: "Professional baseball is a business and it is engaged in interstate commerce." *Flood*, 407 U.S. at 282.

In contrast to other antitrust exemptions, the *Federal Baseball* exemption was not created to reconcile competing legal authorities or substantive policy goals. For example, the judicially-created "state-action doctrine" of *Parker v. Brown*, 317 U.S. 341 (1943), exempts certain state actions from the scope of the federal antitrust laws "to foster and preserve the federal system," *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 633 (1992) ("Our decision [in *Parker*] was grounded in principles of federalism."); *see also*

---

[4] MLB.TV Help Center, *Can I access my subscription from any computer, anywhere, at anytime?* (last accessed Jan. 26, 2023), *available at* https://www.mlb.com/live-stream-games/help-center/subscription-access-can-i-access-my-subscription-anywhere.

*FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 224-25 (2013) ("nothing in the language of the Sherman Act or in its history suggested that Congress intended to restrict the sovereign capacity of the States to regulate their economies" (internal quotation marks omitted)). Similarly, the "nonstatutory labor exemption" immunizes certain activity from the Sherman Act to "accommodat[e] . . . the congressional policy favoring collective bargaining." *Brown v. Pro Football, Inc.*, 518 U.S. 231, 254 (1996). The baseball exemption does no such thing.

The Supreme Court "has refused to extend *Federal Baseball*'s reasoning to other sports leagues." *Alston*, 141 S. Ct. at 2159; *see also id.* (citing the amicus brief for Advocates for Minor Leaguers, which "gather[ed] criticisms" of the exemption). For example, the Court has expressly declined to create a similar exemption for boxing, *United States v. Int'l Boxing Club*, 348 U.S. 236, 244-45 (1955) and football, *Radovich*, 352 U.S. at 450; *see also Haywood v. Nat'l Basketball Ass'n*, 401 U.S. 1204, 1205 (1971) ("Basketball . . . does not enjoy exemption from the antitrust laws."); *Flood*, 407 U.S. at 282–83 ("Other professional sports operating interstate—football, boxing, basketball, and, presumably, hockey and golf—are not so exempt."). Lower courts have similarly refused to create exemptions for other sports leagues. *See, e.g.*, *Amateur Softball Ass'n of Am. v. United States*, 467 F.2d 312, 314 (10th Cir. 1972) (amateur softball); *Bos. Prof'l Hockey Ass'n v. Cheevers*, 348 F. Supp. 261, 265 (D. Mass. 1972) (ice hockey).

Although the Supreme Court has refused to extend the reasoning of *Federal Baseball* to other sports, the Supreme Court has also recognized that "[sports] teams that need to cooperate are not trapped by antitrust law." *American Needle*, 560 U.S. at 202. For example, teams can agree on certain rules, e.g., "things like how many players may be on the field or the time allotted for play," and these agreements are analyzed under the "rule of reason" in light of market realities. *Alston*, 141 S. Ct. at 2156. Moreover, teams can rely on the nonstatutory labor exemption where appropriate. *See Brown*, 518 U.S. at 248; *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶251 (4th ed. 2022) (noting that "many of the antitrust dispute involving professional sports—including those most frequently invoking the baseball exemption—are in fact labor disputes"). And other statutory exemptions, like the Sports Broadcasting Act of 1961 (15 U.S.C. §§ 1291-95), would apply in some circumstances as well. Simply put, the application of antitrust law to professional sports has proven workable.

Respectfully submitted.

s/ Matthew C. Mandelberg

| | |
|---|---|
| JONATHAN S. KANTER<br>  *Assistant Attorney General*<br><br>DOHA G. MEKKI<br>  *Principal Deputy Assistant*<br>  *Attorney General*<br><br>MAGGIE GOODLANDER<br>  *Deputy Assistant Attorney General*<br><br>DAVID B. LAWRENCE<br>  *Policy Director*<br><br>ERIC D. DUNN<br>  *Counsel to the Assistant Attorney General*<br><br>DANIEL S. GUARNERA<br>JACOBUS P. VAN DER VEN<br>  *Attorneys* | DANIEL E. HAAR<br>NICKOLAI G. LEVIN<br>MATTHEW C. MANDELBERG<br>  *Attorneys*<br><br>U.S. DEPARTMENT OF JUSTICE<br>ANTITRUST DIVISION<br>950 Pennsylvania Ave., N.W.<br>Room 3224<br>Washington, D.C. 20530-0001<br>(202) 476-0483<br>matthew.mandelberg@usdoj.gov<br><br>*Counsel for the United States* |

January 30, 2023

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limit of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) and Circuit Rule 29.1(c) because, excluding the parts exempted by Fed. R. App. P. 32(f), the brief contains 2,879 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(b) because the brief has been prepared in Microsoft Word 2019, using 14-point Garamond font, a proportionally spaced typeface.

s/ Matthew C. Mandelberg  
Matthew C. Mandelberg  
*Counsel for the United States*