# 22-2859

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆◆

NOSTALGIC PARTNERS, LLC, DBA THE STATEN ISLAND YANKEES,
ONEONTA ATHLETIC CORPORATION, DBA THE NORWICH SEA UNICORNS,
TRI-CITY VALLEYCATS, INC.,

*Plaintiffs-Appellants,*

SPORTS ENTERPRISES, INC., DBA SALEM-KEIZER VOLCANOES,

*Plaintiff,*

—against—

THE OFFICE OF THE COMMISSIONER OF BASEBALL,
AN UNINCORPORATED ASSOCIATION D/B/A MAJOR LEAGUE BASEBALL,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK, HON. ANDREW L. CARTER
DOCKET NUMBER IN DISTRICT COURT: 1:21-cv-10876-ALC

## BRIEF FOR DEFENDANT-APPELLEE

JEFFREY B. WALL
MORGAN L. RATNER
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW,
Suite 700
Washington, DC 20006
(202) 956-7500

JOHN L. HARDIMAN
BENJAMIN R. WALKER
JACOB G. SINGER
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
(212) 558-4000

*Attorneys for Defendant-Appellee*
*The Office of the Commissioner of Baseball,*
*an Unincorporated Association d/b/a Major League Baseball*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee the Office of the Commissioner of Baseball d/b/a Major League Baseball (MLB) states as follows:

MLB is an unincorporated association and, as such, has no corporate parent. No publicly held corporation owns 10% or more of MLB.

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................ 1

STATEMENT OF THE ISSUES .................................... 6

STATEMENT OF THE CASE ...................................... 6

    A.    Factual Background .................................... 6

        1.    Baseball's Player-Development System ...................... 6

        2.    Expiration Of The PBA And Reorganization Of The Affiliated Minor League System ........................... 9

    B.    Procedural Background ................................ 10

        1.    Plaintiffs' Failed State-Court Suits ........................ 10

        2.    Plaintiffs' Federal Suit ...................................... 11

SUMMARY OF ARGUMENT ...................................... 15

ARGUMENT ...................................................... 18

I.    BASEBALL'S ANTITRUST EXEMPTION BARS PLAINTIFFS' CLAIM .......................................... 19

    A.    The Supreme Court Has Repeatedly Reaffirmed The Antitrust Exemption ............................... 20

    B.    Congress Has Preserved The Exemption's Application To The Minor Leagues ......................... 22

II.    PLAINTIFFS LACK ANTITRUST STANDING AND A PLAUSIBLE ANTITRUST CLAIM .............................. 33

    A.    Plaintiffs Have Failed To Plead Antitrust Injury ............ 33

        1.    Exclusion from an allegedly anticompetitive arrangement is not antitrust injury ........................... 34

# TABLE OF CONTENTS
*(Continued)*

Page

2.  Plaintiffs challenge their exclusion from an allegedly anticompetitive arrangement.......................39

B.  Plaintiffs Have Not Plausibly Alleged A Sherman Act Violation .................................................................46

1.  The restructuring of MLB's minor league system did not violate the Sherman Act..................................48

2.  Plaintiffs have not plausibly alleged a group-boycott conspiracy .......................................................54

CONCLUSION ................................................................57

# TABLE OF AUTHORITIES

Page(s)

Cases

*American Needle, Inc.* v. *National Football League,*
  560 U.S. 183 (2010) .......................................................... 49

*Bell Atl. Corp.* v. *Twombly,*
  550 U.S. 544 (2007) .................................................. 55, 56

*Black Bear Sports Grp., Inc.* v. *Amateur Hockey Ass'n of
  Ill., Inc.,*
  962 F.3d 968 (7th Cir. 2020) ...................................... 35, 36, 38, 50

*Bob Jones Univ.* v. *United States,*
  461 U.S. 574 (1983) .......................................................... 32

*Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.,*
  429 U.S. 477 (1977) .......................................................... 33

*City of Oakland* v. *Oakland Raiders,*
  20 F.4th 441 (9th Cir. 2021).................................... 45, 46

*City of San Jose* v. *Office of Comm'r of Baseball,*
  776 F.3d 686 (9th Cir. 2015) ...................................... 26

*Daniel* v. *American Bd. of Emergency Med.,*
  428 F.3d 408 (2d Cir. 2005)........................................ 40

*Federal Baseball Club of Baltimore* v. *National League of
  Professional Baseball Clubs,*
  259 U.S. 200 (1922) .............................................. 1, 13, 19

*Flood* v. *Kuhn,*
  407 U.S. 258 (1972) ............................................... *passim*

*Forest Grove Sch. Dist.* v. *T.A.,*
  557 U.S. 230 (2009) .......................................................... 23

*Four Corners Nephrology Assocs., P.C.* v. *Mercy Med. Ctr.
  of Durango,*
  582 F.3d 1216 (10th Cir. 2009) (Gorsuch, J.)............................ 35, 38

*Gatt Commc'ns., Inc.* v. *PMC Assocs., L.L.C.*,
711 F.3d 68 (2d Cir. 2013) .................................................... *passim*

*HyPoint Tech., Inc.* v. *Hewlett-Packard Co.*,
949 F.2d 874 (6th Cir. 1991) ........................................... 33

*K.M.B. Warehouse Distribs., Inc.* v. *Walker Mfg. Co.*,
61 F.3d 123 (2d Cir. 1995) ......................................... 46, 47

*Local Beauty Supply, Inc.* v. *Lamaur Inc.*,
787 F.2d 1197 (7th Cir. 1986) ................................. 16, 36

*Lorillard* v. *Pons*,
434 U.S. 575 (1978) ........................................................ 23

*Mayor & City Council of Balt.* v. *Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013) ..................................... 54, 55

*Mid-South Grizzlies* v. *National Football League*,
720 F.2d 772 (3d Cir. 1983) .......................................... 50

*Miranda* v. *Selig*,
860 F.3d 1237 (9th Cir. 2017) ...................................... 21

*National Collegiate Athletic Ass'n* v. *Alston*,
141 S. Ct. 2141 (2021) .............................................. 17, 49

*National Collegiate Athletic Ass'n* v. *Board of Regents of Univ. of Okla.*,
468 U.S. 85 (1984) .................................................... 48, 49

*North Am. Soccer League, LLC* v. *United States Soccer Fed'n, Inc.*,
883 F.3d 32 (2d Cir. 2018) ....................................... 46, 50

*Nostalgic Partners, LLC* v. *New York Yankees P'Ship*,
168 N.Y.S.3d 444 (1st Dep't 2022) .................................. 11

*Nostalgic Partners, LLC* v. *New York Yankees P'ship*,
2021 WL 4143121 (N.Y. Sup. Ct. Sept. 9, 2021) ............................ 11

*Oneonta Athletic Corp.* v. *Detroit Tigers, Inc.*,
Index No. 651080/2022 (N.Y. Sup. Ct. Aug. 29, 2022) .................... 11

*PharmacyChecker.com, LLC* v. *National Ass'n of Boards of Pharmacy*,
530 F. Supp. 3d 301 (S.D.N.Y. 2021) .............................. 37

*Portland Baseball Club, Inc.* v. *Kuhn*,
  491 F.2d 1101 (9th Cir. 1974) ........................................................ 21

*Professional Baseball Schs. & Clubs, Inc.* v. *Kuhn*,
  693 F.2d 1085 (11th Cir. 1982) ..................................................... 21

*Reapers Hockey Ass'n, Inc.* v. *Amateur Hockey Ass'n Ill., Inc.*,
  412 F. Supp. 3d 941 (N.D. Ill. 2019) ............................................. 50

*Seattle Totems Hockey Club, Inc.* v. *National Hockey League*,
  783 F.2d 1347 (9th Cir. 1986) ........................................................ 50

*State* v. *Milwaukee Braves, Inc.*,
  144 N.W. 2d 1 (Wis. 1966) .............................................................. 50

*Texas Dep't of Hous. & Cmty. Affs.* v. *Inclusive Communities Project, Inc.*,
  576 U.S. 519 (2015) ................................................................. 22, 23

*Todorov* v. *DCH Healthcare Auth.*,
  921 F.2d 1438 (11th Cir. 1991) ................................................ 35, 46

*Toolson* v. *New York Yankees, Inc.*,
  346 U.S. 356 (1953) ................................................................. 15, 20

*Tri-City ValleyCats, Inc.* v. *Houston Astros Inc.*,
  2021 WL 3745410 (N.Y. Sup. Ct. Aug. 24, 2021) ........................... 11

*United States* v. *Apple, Inc.*,
  791 F.3d 290 (2d Cir. 2015) ............................................. 18, 54, 55

*Volvo N. Am. Corp.* v. *Men's Int'l Pro. Tennis Council*,
  857 F.2d 55 (2d Cir. 1988) ...................................................... *passim*

*Wyckoff* v. *Office of Comm'r of Baseball*,
  705 Fed. Appx. 26 (2d Cir. 2017) ............................................. 20, 22

## Statutes

15 U.S.C. § 26b(a) ............................................................................ 24

15 U.S.C. § 26b(b) ...................................................................... *passim*

15 U.S.C. § 26b(d) .................................................................... 2, 25

## Other Authorities

H.R. 2511, 117th Cong. (2021) ............................................................ 31

H.R. 3288, 107th Cong. (2001) ............................................................ 31

H.R. 3452, 113th Cong. (2013) ............................................................ 31

S. 1111, 117th Cong. (2021) ................................................................ 31

S. 1704, 107th Cong. (2001) ................................................................ 31

S. 1721, 113th Cong. (2013) ................................................................ 31

S. 3833, 117th Cong. (2022) ................................................................ 31

*The Application of Federal Antitrust Laws to Major League
Baseball: Hearing Before the Sen. Comm. on the
Judiciary*, 107th Cong., 2d Sess. (2002) .................................... 29, 31

*Baseball's Revenue Gap: Pennant for Sale?: Hearing Before
the Sen. Comm. on the Judiciary*, 106th Cong., 2d Sess.
(2000) ............................................................................................... 31

*Exclusive Sports Programming: Examining Competition
and Consumer Choice: Hearing Before the Sen. Comm.
on Commerce, Science and Transportation*, 110th Cong.,
1st Sess. (2007) ................................................................................ 31

*Fairness in Antitrust in National Sports (Fans) Act of 2001:
Hearing Before the H. Comm. on the Judiciary*, 107th
Cong., 1st Sess. (2001)..................................................................... 31

*Out at Home: Why Most Nats Fans Can't See Their Team
on TV: Hearing Before the H. Comm. on Gov't Reform*,
109th Cong., 2d Sess. (2006) ............................................................ 31

*Stadium Financing and Franchise Relocation Act of 1999:
Hearing Before the Sen. Comm. on the Judiciary*, 106th
Cong., 1st Sess. (1999)..................................................................... 31

Herbert Hovenkamp & Phillip E. Areeda, Antitrust Law
(5th ed. 2022)............................................................................ *passim*

Nathaniel Grow, *Regulating Professional Sports Leagues*,
72 Wash. & Lee L. Rev. 573 (2015)................................................. 50

Gary R. Roberts, *A Brief Appraisal of the Curt Flood Act of 1998 from the Minor League Perspective*, 9 Marq. Sports L. J. 413 (1999) ............................................................... 28

*Collective Bargaining Agreement, Jan. 19, 2017,* https://cosmic-s3.imgix.net/3c7a0a50-8e11-11e9-875d-3d44e94ae33f-2017-NBA-NBPA-Collective-Bargaining-Agreement.pdf ................................................................ 52

*Collective Bargaining Agreement Between National Hockey League and National Hockey League Players' Association, Sept. 16, 2012–Sept. 15, 2022,* https://cdn.nhlpa.com/img/assets/file/NHL_NHLPA_2013 _CBA.pdf ................................................................... 52

*Frequently Asked Questions: NBA G League*, NBA G League, https://gleague.nba.com/faq (last visited Feb. 27, 2023) ....................................................................... 52

Letter from United States Senators Richard Durbin, Charles E. Grassley, Richard Blumenthal, and Michael Lee to Commissioner Robert Manfred (July 18, 2022), https://www.judiciary.senate.gov/imo/media/doc/Letter% 20from%20Senators%20to%20Commissioner%20Manfre d%20-%207.18.22.pdf ...................................................... 31

Press Release, Sen. Richard Durbin, Chair of S. Judiciary Comm., Durbin Statement on Minor League Baseball (July 29, 2022), https://www.judiciary.senate. gov/press/dem/releases/durbin-responds-to-mlb-commissioner-manfred ............................................... 31, 32

*Team Affiliates*, Nat'l Hockey League, https://records.nhl.com/franchises/team-affiliates (last visited Feb. 27, 2023) ...................................................... 52

*What You Need to Know About the NBA G League*, NBA G League, https://gleague.nba.com/about/ (last visited Feb. 27, 2023) ....................................................................... 52

## INTRODUCTION

Plaintiffs are three former minor league affiliates of Major League Baseball (MLB) clubs. Before 2020, MLB's player-development system included six minor league tiers, with MLB clubs limited to one affiliate per tier. In 2020, the system was reduced from six tiers to four. Plaintiffs were among the minor league clubs that previously had affiliations with MLB clubs, but were not selected for affiliations in the new four-tier system. In plaintiffs' telling, the restructuring violated the antitrust laws, and MLB has thus far escaped liability only because of a "court-created immunity," Pls. Br. 3: the baseball "antitrust exemption" first recognized in 1922 in *Federal Baseball Club of Baltimore* v. *National League of Professional Baseball Clubs*, 259 U.S. 200 (1922). From the start of this litigation, plaintiffs have been candid about their hope to convince the Supreme Court to revisit that exemption. Pls. Br. 3; J.A. 118, 120 (Pls. Dist. Ct. Br.) 8, 10.

This is a poor test case, for two reasons. First, a challenge to the organization of baseball's minor leagues does not merely implicate a "court-created immunity" but a legislatively endorsed one. After the trio of Supreme Court decisions deciding, reaffirming, and reaffirming yet

again baseball's antitrust exemption, Congress weighed in. It withdrew the exemption for certain major league labor matters but expressly *preserved* the exemption for "any . . . matter relating to organized professional baseball's minor leagues." 15 U.S.C. § 26b(b)(2). And it even instructed courts not to "strictly or narrowly construe[]" the exemption for the minor leagues. *Id.* § 26b(d)(5). Congress thus made a considered judgment to accept and ratify the longstanding judicial view that the antitrust laws do not apply to baseball's minor leagues.

Second, and contrary to plaintiffs' repeated suggestions, baseball has not been emboldened by the antitrust exemption to engage in an anticompetitive restructuring. It has instead continued a traditional player-development system—with a maximum of one minor league affiliate per tier for each major league club—that it has used for decades and that plaintiffs themselves participated in for years without objection. That arrangement is familiar in other sports. For example, the National Hockey League and the National Basketball Association similarly use one-to-one player-development systems. Indeed, MLB is unaware of *any* U.S. professional sports league in which major league teams may adopt unlimited affiliations with minor league teams, and minor leagues (and

-2-

developmental rosters) may accordingly fluctuate to any size. Nothing about a four-tier system, as compared to a one-tier system or a six-tier system, remotely suggests anticompetitive conduct.

Shoddy test case or not, this Court should affirm the district court's judgment of dismissal. The district court correctly concluded that the antitrust exemption applies, plaintiffs conceded as much below, and plaintiffs repeat that concession in this Court. Pls. Br. 37. But the district court did not stop there, and neither should this Court. The district court did not simply apply binding Supreme Court precedent; it also weighed in on whether plaintiffs have otherwise stated a viable antitrust claim. And it got that analysis wrong in important ways that are inconsistent with this Circuit's law. The Court should correct those errors and affirm the dismissal on alternative grounds, not merely speed plaintiffs on their way to the Supreme Court even though they have neither a cognizable injury nor a cognizable claim.

With respect to their injury, this Court has correctly held that a plaintiff lacks standing under the antitrust laws when its asserted "injuries flow from its participation [in] and then exclusion from" an allegedly anticompetitive scheme. *Gatt Commc'ns., Inc.* v. *PMC Assocs.,*

*L.L.C.*, 711 F.3d 68, 77 (2d Cir. 2013).  That is exactly the case here.

Plaintiffs allege that the current four-tier system is anticompetitive

because it limits the number of affiliations with major league clubs.  But

on that theory, the former six-tier system in which plaintiffs participated

was anticompetitive for the same reason.  Plaintiffs' asserted harm—that

their enterprise value has decreased because they have been excluded

from the new system, *e.g.*, J.A. 26 (Compl.) ¶ 68—is not an injury that

entitles them to damages or a return to the old system.

Even setting aside plaintiffs' lack of standing, the antitrust laws do

not forbid MLB from reducing its affiliated minor leagues from six tiers

to four.  To MLB's knowledge, no federal court has ever read the Sherman

Act to regulate the size or membership of a professional sports league.

As the leading treatise explains, it is "clearly not antitrust's job to

determine the appropriate size of a sports league," so a "league may

usually . . . reduce its membership without antitrust condemnation."  XIII

Herbert Hovenkamp & Phillip E. Areeda, Antitrust Law ¶ 2214a (5th ed.

2022).  The Sherman Act is not a one-way ratchet under which MLB may

expand but never contract the size of its developmental system.  Nor is

there the slightest evidence to show a conspiracy by 30 major league clubs

-4-

to boycott 40 minor league clubs—which is presumably why plaintiffs have all but abandoned that alternative theory. *See* Pls. Br. 12-14. At bottom, plaintiffs lack any colorable claim that baseball's restructuring was a violation of the antitrust laws, and the district court erred in holding otherwise.

The district court's errors are important. They go to when a plaintiff has an injury, and may state a claim, under the antitrust laws. In this case, baseball's antitrust exemption meant that the district court had to dismiss regardless. But in other cases, the decision below will allow plaintiffs to complain that reorganizations have left them without a seat at the table, even though they lack antitrust injury under *Gatt* or any valid claim under courts' uniform understanding of the Sherman Act. Plaintiffs should not be permitted to leave that damage in their wake as they rush to the Supreme Court. This Court should address all of the bases for the district court's decision, and hold that this suit fails for three reasons: plaintiffs lack standing, they also lack a viable claim, and the exemption applies to the challenged conduct.

## STATEMENT OF THE ISSUES

1.      Whether the antitrust exemption for the business of baseball bars plaintiffs' claim.

2.      Whether plaintiffs have alleged a cognizable antitrust injury.

3.      Whether plaintiffs have plausibly pleaded that the reorganization of the affiliated minor league system violated Section 1 of the Sherman Act.

## STATEMENT OF THE CASE

### A.      Factual Background

#### 1.      Baseball's Player-Development System

For over a century, MLB clubs have partnered with minor league baseball clubs to develop the skills of players who are under contract with MLB clubs but are not ready for the major leagues.  J.A. 21 (Compl.) ¶ 54. For several decades, until the end of the 2020 season, those arrangements were governed by the Professional Baseball Agreement (PBA), a contract between MLB and the National Association of Professional Baseball Leagues, Inc. (National Association), an umbrella organization of minor leagues and minor league clubs.  J.A. 20 (Compl.) ¶ 50; *see* J.A. 79 (PBA). The PBA incorporated the Major League Rules.  J.A. 82 (PBA Art. VI(A)). The Rules, in turn, imposed uniform terms for every affiliation between

major league clubs and their minor league affiliates. J.A. 87-99 (Rule 56). For example, Rule 56 required all affiliations to be governed by a standard "Player Development Contract," the complete terms of which were also specified. J.A. 87-88 (Rule 56(a)); *see* J.A. 12 (Compl.) ¶ 50. No club was permitted to alter any of the details of the Player Development Contract. J.A. 87-88 (Rule 56(a)); J.A. 82 (PBA Art. VI(A)).

Under the PBA, there were six separate tiers of affiliated minor league baseball: Class AAA, Class AA, Class A Advanced, Class A, Short Season A, and Rookie Advanced. J.A. 21 (Compl.) ¶ 53 & n.5; J.A. 84 (PBA Art. VII(B), (D)). Plaintiffs were in the Short Season A tier. J.A. 13-15 (Compl.) ¶¶ 9-12.

The PBA and Major League Rules provided that MLB clubs could affiliate with "up to six [minor league] teams"—no more than one in each of those six tiers, with no further affiliations outside the six-tier system permitted. J.A. 21 (Compl.) ¶ 53 & n.5; *see* J.A. 30-31 (Compl.) ¶ 88; J.A. 87-88 (Rule 56(a)).[1] MLB clubs agreed to "provide players, coaches, and

---

[1] MLB clubs also operate "Rookie"-level clubs in Arizona, Florida, and/or the Dominican Republic. J.A. 12 (Compl.) ¶ 49 n.4. Those clubs' affiliations were not governed by the PBA and are not at issue in this case. J.A. 12 (Compl.) ¶ 49 n.4.

trainers to its [minor league affiliates] at no cost," and the minor league clubs agreed to share a portion of their ticket revenues with MLB.  J.A. 20 (Compl.) ¶¶ 51-52; *see* J.A. 93-98 (Rule 56(g)).

The PBA required MLB and its clubs to maintain "at least 160" affiliations with minor league teams.  J.A. 83 (PBA Art. VII(A)).  The PBA and Major League Rules also effectively guaranteed that minor league clubs that already had affiliations would remain affiliated for the life of the PBA.  For example, an MLB club could not reduce the number of its affiliates unless it arranged for another MLB club to take over the affiliation.  J.A. 84 (PBA Art. VII(C)(2)).  And MLB clubs seeking to change (rather than eliminate) their affiliations upon the expiration of a Professional Development Contract were permitted to affiliate only with minor league clubs whose contracts had also expired.  J.A. 89-91 (Rule 56(d)).  Finally, if a minor league club's contract expired and it did not agree to a new one, it was assigned an affiliation with one of the 30 MLB clubs.  J.A. 89-91 (Rule 56(d)).  This meant that once a minor league club was selected to be one of the 160 affiliated teams, all of its player costs were paid by an MLB club for the life of the PBA.

2.   **Expiration Of The PBA And Reorganization Of The Affiliated Minor League System**

The PBA expired on September 30, 2020. J.A. 23-24 (Compl.) ¶ 60; J.A. 81 (PBA Art. III(A)). As a result, all existing affiliations between major and minor league teams automatically terminated. J.A. 88-89 (Rule 56(c)). After the expiration of the PBA, baseball's player-development-system was reorganized into a new "Professional Development League" structure. *See* J.A. 101-102 (MLB Press Release).

As part of that reorganization, an MLB company contracted directly with minor league clubs through license agreements, rather than agreeing to a new PBA or other umbrella contract with the National Association. *Id.* The lowest two tiers in the previous system (Short Season A and Rookie Advanced) were eliminated (with many of the clubs in those tiers moving to independent leagues supported by MLB), and each MLB club affiliated with one club in each of the remaining four tiers (Class AAA, Class AA, Class A Advanced, and Full Season A). J.A. 23-24, 34 (Compl.) ¶¶ 60, 100; J.A. 101-102 (MLB Press Release).

As MLB explained at the time, the reorganization was designed to ensure "a new set of standards in terms of facilities and player working conditions" for minor league players. J.A. 101-102 (MLB Press Release).

-9-

Among the benefits, minor league players' salaries would dramatically increase, ranging from 38 to 72% more for 2021 over the previous season's salaries; minor league facilities would be updated and modernized; and minor league players and coaches would travel less during the season, including because the reorganization would improve geographical alignment. J.A. 101-102.

As part of the reorganization, MLB also created or partnered with unaffiliated minor leagues, whose players are not paid by MLB clubs. Those teams, many of which were affiliated with MLB clubs prior to the reorganization, typically include either professional players under contract with the minor league team or college players preparing for the MLB draft. J.A. 34 (Compl.) ¶ 100.

### B. Procedural Background

#### 1. Plaintiffs' Failed State-Court Suits

Plaintiffs are three minor league clubs that, until 2020, were affiliates of MLB clubs in the now-eliminated Short Season A tier. J.A. 13-15 (Compl.) ¶¶ 9-12. Plaintiffs were not among the 120 minor league clubs chosen to affiliate in the four remaining tiers in the reorganized minor league system.

-10-

After the PBA expired and their affiliations ended, plaintiffs each filed lawsuits against MLB and other defendants in state court, asserting various state-law tort and contract theories. The vast majority of those claims—for breach of implied contract, breach of fiduciary duty, violations of state franchise and unfair trade practices laws, unjust enrichment, tortious interference with business relations, and tortious interference with several contracts—were dismissed. Plaintiffs' sole claims to survive a motion to dismiss allege tortious interference with a supposed contract among the 160 minor league clubs to act in concert (a requirement that would itself be anticompetitive under plaintiffs' theory in this case). *See Tri-City ValleyCats, Inc.* v. *Houston Astros Inc.*, 2021 WL 3745410 (N.Y. Sup. Ct. Aug. 24, 2021); *Nostalgic Partners, LLC* v. *New York Yankees P'ship*, 2021 WL 4143121 (N.Y. Sup. Ct. Sept. 9, 2021); *Nostalgic Partners, LLC* v. *New York Yankees P'Ship*, 168 N.Y.S.3d 444 (1st Dep't 2022); *Oneonta Athletic Corp.* v. *Detroit Tigers, Inc.*, Index No. 651080/2022 (N.Y. Sup. Ct. Aug. 29, 2022).

## 2. Plaintiffs' Federal Suit

In December 2021, having been largely stymied in their state-court suits, plaintiffs filed this federal antitrust action. Plaintiffs' sole claim is

that, when MLB and its 30 member clubs reorganized the player-development system, they violated Section 1 of the Sherman Act.

In their complaint, plaintiffs allege that MLB and its clubs unlawfully entered into horizontal agreements (i) to shrink the minor league system from six tiers to four, and correspondingly reduce the number of affiliations from a maximum of 180 to 120; and (ii) to engage in a "group boycott" of formerly affiliated minor league teams, including plaintiffs. J.A. 10-11, 23-24, 38 (Compl.) ¶¶ 3, 60, 111. In other words, plaintiffs allege that the 30 MLB clubs not only agreed to restructure the minor league system, but also agreed on "which [minor league] teams' affiliations to cut." J.A. 10-11 (Compl.) ¶ 3.

Plaintiffs assert that these purported agreements "to restrict output and boycott the Ousted Teams" are *per se* unlawful, J.A. 30 (Compl.) ¶ 87, and caused "antitrust injury" in the form of a decline in enterprise value compared to their values as participants in the pre-2020 minor league system, J.A. 26 (Compl.) ¶ 68; *see* J.A. 9-10, 39 (Compl.) ¶¶ 1, 115, 118. Plaintiffs claim such a decline has occurred because "some—if not *all*—of [the] patrons" who attended games when plaintiffs had affiliations "will choose not to purchase tickets" now that they do not;

-12-

and "some—if not *all*—of the [p]laintiffs' sponsors will choose not to honor their sponsorship agreements, further decreasing the revenues that the [p]laintiffs are able to generate" as compared to the revenues generated when they had affiliations.  J.A. 26 (Compl.) ¶¶ 70-71.

MLB moved to dismiss.  It explained that plaintiffs' suit is barred under baseball's longstanding exemption from the federal antitrust laws, adopted in *Federal Baseball Club of Baltimore* v. *National League of Professional Baseball Clubs*, 259 U.S. 200 (1922), and preserved by Congress in the Curt Flood Act of 1998, *see* 15 U.S.C. § 26b(b)(2).  Indeed, plaintiffs conceded as much in their district-court briefing.  *See* J.A. 113 (Pls. Dist. Ct. Br.).  MLB alternatively moved to dismiss on the grounds that plaintiffs lack antitrust standing and had failed to plausibly plead an antitrust claim.

The district court dismissed the case under the antitrust exemption—as plaintiffs had conceded it must—but first weighed in on plaintiffs' antitrust claims.  On antitrust injury, the court stated that plaintiffs' alleged injury was "their inability to compete for affiliations with major league teams" and concluded that the injury was "directly linked to the [alleged] anticompetitive act" of "preventing MLB clubs

from competing with each other to affiliate with more minor league teams." S.P.A. 8.

On the merits, the district court concluded that plaintiffs had plausibly pleaded a violation of the Sherman Act. The court first explained that it would apply the rule of reason, believing it would be "inappropriate to apply the per se rule" of illegality or "quick look" review to horizontal "agreements within sports leagues." S.P.A. 12-13 (internal quotation marks omitted). The court then found that plaintiffs had plausibly alleged that the restructuring of the minor leagues violated the rule of reason. The court accepted plaintiffs' proposed market—a market for affiliations with MLB clubs—and found it plausible that "a competitive market without the [challenged] agreement would have produced a greater number of affiliations, as shown by the greater output under the PBA." S.P.A. 11; *see* S.P.A. 14-15. The court declined to consider whether plaintiffs had plausibly alleged an agreement not to affiliate with them within the reorganized system. S.P.A. 11 n.2.

Finally, the district court dismissed plaintiffs' claim as foreclosed by the antitrust exemption. The court quoted the Supreme Court's clear statement in *Flood* v. *Kuhn*, 407 U.S. 258 (1972), that, even as of the

1970s, "the exemption was long standing and should be remedied by 'Congress and not this Court.'" S.P.A. 16 (quoting *Flood*, 407 U.S. at 284). The district court thus concluded that, "[e]ven analyzing the exemption narrowly," it plainly "encompass[es] the claims here." S.P.A. 16-17.

## SUMMARY OF ARGUMENT

I.     The business of baseball's century-old exemption from the antitrust laws requires dismissal of this action.  Plaintiffs do not dispute that, nor could they.  The Supreme Court itself has applied the exemption and upheld the dismissal of antitrust claims implicating minor league baseball.  *See Toolson* v. *New York Yankees, Inc.*, 346 U.S. 356, 357 (1953).  So have the courts of appeals.  And key here, Congress itself has ratified that construction of the antitrust laws.  When it enacted the Curt Flood Act, which partially withdrew the exemption for the major leagues, Congress took the unusual step of expressly preserving the exemption for all "matter[s] relating to organized professional baseball's minor leagues."  15 U.S.C. § 26b(b)(1)-(2).  That targeted action evinced Congress's awareness and approval of the exemption in these circumstances.  At a minimum, the Curt Flood Act confirms what the Supreme Court said 50 years ago, and what remains true today:

"Congress, by its positive inaction," has "clearly evinced a desire not to disapprove" the application of the exemption to the minor leagues. *Flood* v. *Kuhn*, 407 U.S. 258, 283-284 (1972).

II.    The district court did not stop with the antitrust exemption, and neither should this Court.  It should correct the district court's errors of law, and confirm that plaintiffs' grievances do not add up to a viable antitrust claim even setting aside the exemption.

A.    As a threshold matter, plaintiffs have not suffered the special kind of harm known as antitrust injury.  The well-established rule is that a plaintiff lacks antitrust injury when its true harm is that it can no longer "continue to take advantage of . . . antitrust conduct" it now challenges.  *Local Beauty Supply, Inc.* v. *Lamaur Inc.*, 787 F.2d 1197, 1202-1203 (7th Cir. 1986); *see Gatt Commc'ns., Inc.* v. *PMC Assocs., L.L.C.*, 711 F.3d 68, 77 (2d Cir. 2013).  That describes plaintiffs to a tee.  Their injury is the alleged decrease in their "enterprise value[s]" compared to when they had their affiliations.  J.A. 26 (Compl.) ¶ 68.  But that value depended on plaintiffs' prior participation in the affiliated minor league system—a system which, under the logic of their arguments, was just as anticompetitive.  Previously, the Rules allowed

-16-

MLB clubs to have one affiliation per six tiers; now, MLB allows one affiliation per four. The antitrust laws do not allow plaintiffs to be compensated for being left out of supposedly anticompetitive arrangements.

B. Plaintiffs also do not plausibly plead anything approaching a violation of the antitrust laws. In their complaint and before the district court, plaintiffs alleged two unlawful agreements: (1) an agreement to restructure the minor league into four tiers, with a total of 120 affiliates, and (2) a further, specific agreement on which minor league clubs would lose their affiliations. They now appear to have abandoned the latter allegation, but neither plausibly alleges an antitrust violation.

First, an agreement on the number of teams that may participate is precisely the kind of horizontal agreement that is "necessary to . . . create or maintain a league sport," and therefore survives rule of reason review as a matter of law. *National Collegiate Athletic Ass'n* v. *Alston*, 141 S. Ct. 2141, 2156 (2021); XIII Herbert Hovenkamp & Phillip E. Areeda, Antitrust Law ¶ 2214a (5th ed. 2022) ("[I]t is clearly not antitrust's job to determine the appropriate size of a sports league."). That is why no federal court has ever ordered any sports league—

antitrust exemption or not—to expand in order to accommodate an additional team that wishes to join.

Second, plaintiffs' allegations of a group boycott of specific minor league teams do not come close to the line of plausibility. Plaintiffs do virtually nothing to answer the "first crucial question in a Section 1 case": whether "the challenged conduct stems from . . . an agreement," rather than "from independent conduct." *United States* v. *Apple, Inc.*, 791 F.3d 290, 314-315 (2d Cir. 2015) (internal quotation marks omitted).

## ARGUMENT

This Court should affirm the judgment below for three independent reasons. First, the exemption from the antitrust laws for the business of baseball applies to the operation of minor leagues, and plaintiffs concede as much. Second, plaintiffs' asserted harm—that they no longer enjoy the benefits of an allegedly anticompetitive system—is not cognizable antitrust injury. Third, plaintiffs' primary claim—that contracting from six minor league tiers to four is unlawful—is not a plausible violation of the antitrust laws. There is nothing magical about the number of minor league affiliations that a professional sports league allows, whether one (NBA), two (NHL), or four rather than six (MLB). Plaintiffs are

understandably upset that the reorganization left them without seats at the table, but having largely failed to challenge that reorganization under state tort and contract law, they cannot dress up their frustration in the language of the federal antitrust laws.

## I. BASEBALL'S ANTITRUST EXEMPTION BARS PLAINTIFFS' CLAIM

Under Supreme Court precedent stretching back over a century, the "business of baseball" is exempt from the Sherman Act. *Federal Baseball Club of Balt.* v. *National League of Pro. Baseball Clubs*, 259 U.S. 200, 208-209 (1922). Although plaintiffs argue that the exemption's scope is uncertain, they do not dispute that operating the minor leagues is part of the business of baseball. Plaintiffs thus acknowledge that the exemption applies here and that this Court should affirm. But because plaintiffs intend to ask the Supreme Court to revisit the exemption, they spend much of their opening brief criticizing the exemption and implicitly inviting this Court to do the same. The Court should decline that invitation. The Supreme Court has repeatedly emphasized that any reconsideration of the exemption is for Congress, not the courts. Congress did that in 1998 when it passed the Curt Flood Act and specifically preserved the exemption for minor league baseball. The

Supreme Court's reasoning and Congress's conduct mean that there is neither need nor warrant for this Court to reexamine the continued application of the exemption to minor league baseball.

### A.    The Supreme Court Has Repeatedly Reaffirmed The Antitrust Exemption

"Since 1922 . . . the Supreme Court has recognized a judicially created exemption from antitrust regulation for the business of baseball." *Wyckoff* v. *Office of Comm'r of Baseball*, 705 Fed. Appx. 26, 28 (2d Cir. 2017).    Over that century, the Court has twice reconsidered the exemption, applied principles of *stare decisis*, and refused to overturn it. *See Toolson* v. *New York Yankees, Inc.*, 346 U.S. 356, 357 (1953); *Flood* v. *Kuhn*, 407 U.S. 258, 284 (1972).  In *Toolson*, the Court explained that "if there are evils in this field which now warrant application to it of the antitrust laws it should be by legislation."  346 U.S. at 357.  And in *Flood*, the Court "adhere[d] once again to *Federal Baseball* and *Toolson*" and reiterated that any change to the exemption must be made "by the Congress and not by this Court."  407 U.S. at 284.  The exemption thus remains "binding precedent from the Supreme Court and from this Circuit."  *Wyckoff*, 705 Fed. Appx. at 29.

The organization of baseball's minor league system "falls squarely within" the exemption. *Miranda* v. *Selig*, 860 F.3d 1237, 1242 (9th Cir. 2017). A player-development system is central to the business of baseball. *Toolson* itself involved a challenge brought by minor league baseball players. *See* Pet. Br., *Toolson*, 1953 WL 78316, at *5-9 (Sept. 16, 1953). And a number of lower courts have applied the exemption in cases involving the minor leagues. *See*, *e.g.*, *Professional Baseball Schs. & Clubs, Inc.* v. *Kuhn*, 693 F.2d 1085, 1085-1086 (11th Cir. 1982); *Portland Baseball Club, Inc.* v. *Kuhn*, 491 F.2d 1101, 1103 (9th Cir. 1974). Accordingly, plaintiffs have never disputed the applicability of the exemption to this case—neither before the district court, nor before this Court.

Plaintiffs do, however, devote much ink to cataloguing what they believe to be disagreements among lower courts about the "scope and application of the baseball exemption" in other contexts. Pls. Br. 24; *see* U.S. Amicus Br. 7-8 (making similar arguments). As MLB explained below, the claim of disarray is greatly overstated. *See* J.A. 193-194 (MLB Reply). More importantly, it is irrelevant here; plaintiffs concede that *this case* falls within the exemption, and that, however broadly or

narrowly the exemption applies under current law, it applies to this case. *See* Pls. Br. 3 ("Plaintiffs concede that the judicially-crafted baseball exemption, as applied by this Circuit . . . , presently bars Plaintiffs' antitrust claim here."); *see also* U.S. Amicus Br. 8 ("[T]he Court need not resolve the exemption's precise contours because plaintiffs have conceded that the conduct they allege falls within the [exemption's] scope. . . .").

## B.   Congress Has Preserved The Exemption's Application To The Minor Leagues

In conceding that their claim must be dismissed, plaintiffs denigrate the exemption as a supposed creature of "judicial legislation." Pls. Br. 11.  But Congress itself has also directed that plaintiffs' claim cannot move forward.  In 1998, Congress enacted the Curt Flood Act, which "created an exception to baseball's antitrust exemption for major league baseball players."  *Wyckoff*, 705 Fed. Appx. at 29.  The Act otherwise left the exemption in place, and in particular Congress left the exemption in place for the minor leagues, *see* 15 U.S.C. §§ 26b(b)(2) and (d)(5).  That targeted legislative decision—to withdraw the exemption, but only in part—is "convincing support for the conclusion that Congress accepted and ratified" the exemption as to all other matters, including

the minor leagues. *Texas Dep't of Hous. & Cmty. Affs.* v. *Inclusive Communities Project, Inc.*, 576 U.S. 519, 536 (2015).

1. "Congress is presumed to be aware of . . . [a] judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change," *Lorillard* v. *Pons*, 434 U.S. 575, 580 (1978), or "amend[s] [it] without altering the [relevant] text," *Forest Grove Sch. Dist.* v. *T.A.*, 557 U.S. 230, 244 n.11 (2009). For example, in *Inclusive Communities*, the Supreme Court concluded that Congress had "accepted and ratified the unanimous holdings of the Courts of Appeals finding disparate-impact liability" under the Federal Housing Act when it had amended the Act "while still adhering to the . . . language" that those courts had read to embrace a disparate-impact theory. 576 U.S. at 536. The Court explained that Congress had been "aware of this unanimous precedent" and, "with that understanding," "made a considered judgment to retain the relevant statutory text," which "signal[ed] that Congress ratified disparate-impact liability." *Id.* at 536, 538.

The same conclusion is warranted here. In enacting the Curt Flood Act, Congress was indisputably aware that the Supreme Court had for

more than 75 years interpreted the antitrust statutes to exempt the business of baseball. It chose to amend the Clayton Act by adding a new section that eliminated the exemption for player-contract matters in the major leagues. *See* 15 U.S.C. § 26b(a). But Congress otherwise left the exemption as it stood. Indeed, it told courts to do the same: subsection (b) of the Act instructs that "[n]o court shall rely on the enactment of [the Act] as a basis for changing the application of the antitrust laws to any conduct, acts, practices or agreements other than those set forth in subsection (a) [relating to major league player-contract matters]." *Id.* § 26b(b). Congress thus indicated that its withdrawal of the exemption for certain major league activities should not be construed as a signal to withdraw the exemption elsewhere.

Congress, however, went even further. Following lobbying efforts by minor league owners, Congress expressly acknowledged and preserved the exemption's applicability to the minor leagues. Subsection (b) specifies that no court should construe the Act to "create, permit or imply a cause of action by which to challenge under the antitrust laws, or otherwise apply the antitrust laws to," various aspects of baseball other than major league players. 15 U.S.C. § 26(b). Among

-24-

them, Congress said that the Act should not disturb "the agreement between organized professional major league baseball teams and the teams of the National Association of Professional Baseball Leagues, commonly known as the 'Professional Baseball Agreement', *the relationship between organized professional major league baseball and organized professional minor league baseball*, or *any other matter relating to organized professional baseball's minor leagues*." *Id.* § 26b(b)(2) (emphasis added).

That language is obviously quite broad. Congress did not act simply to preserve the then-existing PBA between the major and minor leagues. It wanted to protect from antitrust scrutiny "the relationship between organized professional major league baseball and organized professional minor league baseball," or indeed "any other matter relating to organized professional baseball's minor leagues." 15 U.S.C. § 26b(b)(2). And just in case there were any doubt, Congress took the unusual step of instructing courts that the "scope of the conduct, acts, practices, or agreements covered by subsection (b) *shall not be strictly or narrowly construed.*" *Id.* § 26b(d)(5) (emphasis added). The statutory text could hardly be more clear that Congress "made a considered judgment" to

"accept[] and ratif[y]" the established application of the antitrust laws to the minor leagues. *Inclusive Communities*, 576 U.S. at 536.

The Ninth Circuit reached a similar conclusion in an antitrust action challenging the relocation of an MLB franchise. *See City of San Jose* v. *Office of Comm'r of Baseball*, 776 F.3d 686, 691 (9th Cir. 2015). As it did with the minor leagues, the Curt Flood Act specifically preserved the exemption's application to franchise relocation. *See* 15 U.S.C. § 26b(b)(3). As the Ninth Circuit explained, that specific preservation "demonstrate[d] that Congress (1) was aware of the possibility that the baseball exemption could apply to franchise relocation; (2) declined to alter th[at] status quo . . . ; and (3) had sufficient will to overturn the exemption in other areas." *City of San Jose*, 776 F.3d at 691. The court thus concluded that its "ability to infer congressional intent to leave that issue undisturbed [was] at its apex." *Id.* The same reasoning applies equally here.

2.     Plaintiffs read the Curt Flood Act differently. In their view, Congress was *ambivalent* about the application of the exemption to aspects of baseball other than major league players. Plaintiffs largely rely on legislative history, *see* Pls. Br. 28-31, but they point to

-26-

subsection (b)'s statement that "no court shall rely on the enactment of [the Act] as a basis for changing the application of the antitrust laws to any [other] conduct," 15 U.S.C. § 26b(b).  According to plaintiffs, by specifying that the Curt Flood Act would not disturb various other aspects of baseball—including the relationship between the major and minor leagues—Congress was "neutral about the baseball exemption's scope and continued vitality," leaving "all other antitrust issues [to] revert to the courts."  Pls. Br. 28-29.

Subsection (b) cannot plausibly be read as a statement of mere neutrality or ambivalence.  When Congress told courts not to rely on the Act "as a basis for changing the application of the antitrust laws," it meant that courts should not depart from the status quo—under which the exemption applied.  After all, Congress had just done the opposite in subsection (a):  it had *withdrawn* the antitrust exemption for certain major league activities.  Moreover, the remainder of subsection (b) makes clear that Congress was concerned with judicial efforts to *roll back* the exemption on the basis of the Act's passage.  Congress specifically directed courts not to "*create*, *permit*, or *imply* a cause of action" under the antitrust laws or to "*apply* the antitrust laws" to conduct outside

-27-

subsection (a). 15 U.S.C. § 26b(b) (emphasis added). Subsection (b) was thus aimed at preserving the status quo—*i.e.*, the application of the exemption to, among other things, "the relationship between organized professional major league baseball and organized professional minor league baseball." *Id.* § 26b(b)(2).

To the extent relevant, the Act's legislative history supports the plain meaning of subsection (b). The main impetus for the addition of that provision was the need to "clarify" that the bill "would have no impact on the legal status of the minor leagues." J.A. 144 (S. Rep. No. 105-118) at 4. That need arose in response to minor league teams' fears that the Act might be seen as having "opened the door for judicial reconsideration from scratch of the entire" exemption. Gary R. Roberts, *A Brief Appraisal of the Curt Flood Act of 1998 from the Minor League Perspective*, 9 Marq. Sports L. J. 413, 421 (1999). In response to that concern, the drafters added subsection (b) to close the door to any such "negative inference." J.A. 145 (S. Rep. No. 105-118) at 5. The individual floor statements relied on by plaintiffs, in which two Senators stated that the Act was "intended to have no effect other than to clarify the status of the major league players," *see* Pls. Br. 30, were made in that context.

-28-

And other legislators made clear that they saw the Act as "barring minor league players or [others] from using the antitrust laws to attack issues" related to "minor league baseball." J.A. 168 (Statement of Rep. Steven Chabot).[2]

3. Even if Congress did not ratify the application of the exemption to the minor leagues in the Curt Flood Act, a century's worth of legislative inaction means that at a minimum Congress has acquiesced in and approved the exemption for matters other than major league

---

[2] *See* J.A. 161 (Statement of Rep. Henry Hyde) (Subsection (b) was revised "to address concerns raised by owners of the minor league teams . . . that the original version of [the bill] was not sufficiently clear to preserve antitrust protection for," among other things, "the relationship between the major league clubs and the minor league clubs."); *id.* ("The bill was carefully drafted . . . to leave the remainder of the exemption [beyond those matters covered in subsection (a)] intact."); J.A. 163 (Statement of Rep. John Conyers) ("[C]oncerns have been previously raised that by repealing the antitrust exemption we would somehow be disrupting the operation of the minor leagues. . . . This legislation carefully eliminates these matters from the scope of new antitrust coverage."); J.A. 165 (Statement of Rep. Hutchinson) ("[T]his also recognizes the importance of an antitrust exemption for certain aspects of the game so team owners may continue to cooperate. . . . So it protects and helps minor league baseball. . . ."); *see also The Application of Federal Antitrust Laws to Major League Baseball: Hearing Before the S. Comm. on the Judiciary*, 107th Cong. 35 (2002) (Statement of Stanley M. Brand, Vice President, Minor League Baseball) ("[W]e . . . fought hard to include a clear and comprehensive carve-out for the minors during enactment of the Curt Flood Act.").

-29-

player contracts. The Supreme Court has twice said exactly that. In *Toolson*, just over 30 years after *Federal Baseball*, the Court remarked that, because "[t]he business [of baseball] ha[d] been left for thirty years to develop, on the understanding that it was not subject to existing antitrust legislation," any adjustments to the exemption were for Congress, not the courts. 346 U.S. at 357. And 20 years later in *Flood*, the Court observed that "Congress, by its positive inaction, ha[d] . . . clearly evinced a desire not to disapprove [*Toolson* and *Federal Baseball*] legislatively." 407 U.S. at 283-284. Indeed, *Flood*'s core holding was that, given Congress's demonstrated acquiescence in the exemption, any decision to withdraw or amend it should be left to the legislature. *Id.* at 285.

Congressional inaction on the exemption should not be confused with disinterest. In *Flood*, the Supreme Court cited repeated failed legislative attempts to override the exemption. *See* 407 U.S. at 281 ("Since *Toolson* more than 50 bills have been introduced in Congress relative to the applicability or nonapplicability of the antitrust laws to baseball."). That congressional scrutiny continued in the period between *Flood* and the enactment of the Curt Flood Act, during which Congress

held nearly 40 hearings on the business of baseball. *See* J.A. 75-78. And attempts to further modify the exemption have continued since the Act was passed. Since 1998, Congress has considered seven different legislative proposals on the subject,[3] and held at least six hearings.[4] As recently as the last Congress, the Senate Judiciary Committee inquired into the exemption as it pertains to the minor leagues. *See* Letter from Senators Richard Durbin, Charles E. Grassley, Richard Blumenthal, and Michael Lee to Commissioner Robert Manfred (July 18, 2022), https://www.judiciary.senate.gov/imo/media/doc/Letter%20from%20Sen ators%20to%20Commissioner%20Manfred%20-%207.18.22.pdf. The

---

[3] *See* S. 3833, 117th Cong. (2022); S. 1111, 117th Cong. (2021); H.R. 2511, 117th Cong. (2021); S. 1721, 113th Cong. (2013); H.R. 3452, 113th Cong. (2013); S. 1704, 107th Cong. (2001); H.R. 3288, 107th Cong. (2001).

[4] *See Exclusive Sports Programming: Examining Competition and Consumer Choice: Hearing Before the Sen. Comm. on Commerce, Science and Transportation*, 110th Cong., 1st Sess. (2007); *Out at Home: Why Most Nats Fans Can't See Their Team on TV: Hearing Before the H. Comm. on Gov't Reform*, 109th Cong., 2d Sess. (2006); *The Application of Federal Antitrust Laws to Major League Baseball: Hearing Before the Sen. Comm. on the Judiciary*, 107th Cong., 2d Sess. (2002); *Fairness in Antitrust in National Sports (Fans) Act of 2001: Hearing Before the H. Comm. on the Judiciary*, 107th Cong., 1st Sess. (2001); *Baseball's Revenue Gap: Pennant for Sale?: Hearing Before the Sen. Comm. on the Judiciary*, 106th Cong., 2d Sess. (2000); *Stadium Financing and Franchise Relocation Act of 1999: Hearing Before the Sen. Comm. on the Judiciary*, 106th Cong., 1st Sess. (1999).

Committee even considered holding a seventh hearing, *see* Press Release, Sen. Richard Durbin, Chair of S. Judiciary Comm., Durbin Statement on Minor League Baseball (July 29, 2022), https://www.judiciary.senate.gov/press/dem/ releases/durbin-responds-to-mlb-commissioner-manfred, but ultimately declined to do so.

Congress's consistent decision over many decades not to disturb the application of the exemption to the minor leagues "make[s] out an unusually strong case of legislative acquiescence." *Bob Jones Univ.* v. *United States*, 461 U.S. 574, 599 (1983). Congress has long been, "by its own studies and by public discourse, constantly reminded" of the exemption. *Id.* And for 50 years, it has been aware of *Flood*'s holding that any problem with the exemption "is to be remedied by the Congress and not by" the judiciary. 407 U.S. at 284; *see id.* at 285 ("And what the Court said in *Federal Baseball* in 1922 and what it said in *Toolson* in 1953, we say again here in 1972: the remedy, if any is indicated, is for congressional, and not judicial, action."). This century-long course of conduct "cannot be read other than as indicating approval." *Bob Jones*, 461 U.S. at 601-602.

## II. PLAINTIFFS LACK ANTITRUST STANDING AND A PLAUSIBLE ANTITRUST CLAIM

Baseball's antitrust exemption is a sufficient ground for affirmance, but this Court should not stop there because the district court did not and its decision upends established antitrust principles. Rather than leave that decision on the books to undermine circuit law, and in the process allow plaintiffs to rush their shoddy test case to the Supreme Court, this Court should correct the district court's errors and affirm the dismissal of this suit on those alternative grounds as well.

### A. Plaintiffs Have Failed To Plead Antitrust Injury

To state a claim here, plaintiffs must demonstrate that they have "antitrust standing"—which is not a species of Article III standing but rather a statutory requirement. To establish antitrust standing, plaintiffs must show that they have suffered "antitrust injury," *i.e.*, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). This requirement "is at the center of all antitrust law and policy," *HyPoint Tech., Inc.* v. *Hewlett-Packard Co.*, 949 F.2d 874, 877 (6th Cir. 1991), as it ensures that a plaintiff's "interest coincides with the public interest in

-33-

vigorous competition," *Volvo N. Am. Corp.* v. *Men's Int'l Pro. Tennis Council*, 857 F.2d 55, 67 (2d Cir. 1988). It is thus "a threshold, pleading-stage inquiry," and courts "must dismiss . . . as a matter of law" any case in which the plaintiff has not sufficiently pleaded it. *Gatt Commc'ns., Inc.* v. *PMC Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013).

Plaintiffs have not sufficiently pleaded an antitrust injury. The well-established rule is that a party lacks antitrust injury when it seeks compensation for its exclusion from an anticompetitive arrangement. *See Gatt*, 711 F.3d at 77 & n.10. That is precisely what plaintiffs want here. They allege that the current four-tier system is anticompetitive because it limits the number of affiliations with major league clubs. But on that theory, the former six-tier system in which they participated was anticompetitive for the same reason. Plaintiffs cannot seek remedies for being excluded from a system that they believe was itself unlawful. The antitrust laws are not a means for a supposed cartelist to liquidate its unrealized profits from the alleged cartel.

## 1. Exclusion from an allegedly anticompetitive arrangement is not antitrust injury

a. Although there is no "*per se* rule" that a beneficiary of an anticompetitive arrangement may not bring an antitrust suit, plaintiffs

-34-

who previously participated in assertedly anticompetitive conduct must show "injury of the type the antitrust laws were intended to prevent." *Volvo*, 857 F.2d at 67. For example, a "restraint that merely prevents a cartel member from acquiring a greater share of the fruits of the cartel would not cause the member to suffer antitrust injury." *Id.* Such "inability . . . to benefit from anticompetitive conduct is not the type of market distortion that the antitrust laws were promulgated to correct." *Todorov* v. *DCH Healthcare Auth.*, 921 F.2d 1438, 1454 (11th Cir. 1991).

Courts have applied that principle in a variety of contexts in which the would-be antitrust plaintiff seeks to join the allegedly anticompetitive scheme. *See Todorov*, 921 F.2d at 1453-1454 (no antitrust injury where plaintiff's "alleged damages equal the profits he would have garnered had he been able to share" in anticompetitive arrangement); *see also Four Corners Nephrology Assocs., P.C.* v. *Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1225-1226 (10th Cir. 2009) (Gorsuch, J.) (no antitrust injury in similar attempt to join alleged physician cartel and obtain damages stemming from exclusion from the alleged cartel). Applying that same principle, the Seventh Circuit recently concluded that a skating rink owner lacked antitrust standing

to "use the Sherman Act to compel" an allegedly anticompetitive hockey league to "admit [the plaintiff] as a member and permit it to sponsor a club." *Black Bear Sports Grp., Inc.* v. *Amateur Hockey Ass'n of Ill., Inc.*, 962 F.3d 968, 970-971 (7th Cir. 2020).

Just like the antitrust laws are not a means to *join* allegedly anticompetitive arrangements, neither are they a means to *remain* in them. *See, e.g.*, *Local Beauty Supply, Inc.* v. *Lamaur Inc.*, 787 F.2d 1197, 1202-1203 (7th Cir. 1986) (no antitrust injury when the plaintiff's harm results from its "inability to continue to take advantage of . . . [anticompetitive] conduct"). This Court's decision in *Gatt* is particularly instructive. In *Gatt*, the plaintiff had been one of several licensed dealers for a radio manufacturer, and had participated for years in an alleged bid-rigging scheme with the other dealers. 711 F.3d at 72-73. It eventually broke ranks, and the manufacturer responded by terminating its dealership agreement. *Id.* at 73. The former dealer sued, seeking to recover for the "harm it suffered as a consequence of its inability to continue selling [the manufacturer's] products." *Id.* at 77. This Court "easily" found "an absence of antitrust injury." *Id.* at 77 n.10. As it explained, the antitrust laws "are not concerned with" the kind of injuries

that the *Gatt* plaintiff had asserted—injuries that "flow[ed] from its participation and then exclusion from" a scheme "in which [the dealer] had no right *ab initio* to participate." *Id.* at 77; *cf. PharmacyChecker.com, LLC* v. *National Ass'n of Boards of Pharmacy*, 530 F. Supp. 3d 301, 332 (S.D.N.Y. 2021) (finding antitrust injury where, "unlike in *Gatt*, the [complaint] does not allege an injury based on [p]laintiff's exclusion from a conspiracy or cartel").

b.     Rather than scrutinize plaintiffs' complaint under these principles, the district court appeared to believe that MLB was raising an unclean-hands or *in pari delicto* argument that the plaintiffs were foreclosed from any antitrust suit because they participated in the pre-2020 minor league system. *See* S.P.A. 6 & n.1 ("The Second Circuit has held that 'regardless of how [a plaintiff] entered the market, once [the plaintiff] was in the market it had a right to do business in a market undistorted by unlawful anticompetitive conduct.'") (citation omitted).  If that were MLB's argument, the district court would have been right to reject it. *See Volvo*, 857 F.2d at 67.  Even a "cartel member has antitrust standing to challenge the cartel," if it "credibly asserts that it would be better off if it were free to compete." *Id.*  In that case, the member's

interest in being free of the cartel "coincides with the public interest in vigorous competition," *id.*, and it may enforce the antitrust laws.

By contrast, if the plaintiff instead seeks to share in "the fruits of the cartel," it cannot establish antitrust injury. *Volvo*, 857 F.2d at 67; *see Black Bear Sports*, 962 F.3d at 970 (no standing where plaintiff sought to join cartel hockey league, rather than an "order dissolving the [league] and allowing free competition"); *Four Corners Nephrology*, 582 F.3d at 1226 (no standing where plaintiff sought "the chance to *share* in [the] putative monopoly," rather than "prevent a monopoly or break one apart"). Antitrust injury exists where the plaintiff seeks to disband the allegedly anticompetitive arrangement but not where its complaint, as in *Gatt*, is that the plaintiff will be unable to reap the benefits of its anticompetitive conduct. IIA Hovenkamp & Areeda ¶ 348.

The district court distinguished *Gatt* on the ground that the claimed injury there "did not flow from what made the bid-rigging scheme unlawful," whereas plaintiffs' asserted injury here "is directly linked to the anticompetitive act." S.P.A. 7-8. But even if there is a connection between the claimed injury and the claimed antitrust violation, the animating purpose of the antitrust-injury requirement is that it must be

the *right* connection. The plaintiff in *Gatt* also alleged, just like plaintiffs here, that the termination of its (anticompetitive) agreement was itself anticompetitive and caused the plaintiff injury by excluding it from the market. 711 F.3d at 77; *see* J.A. 258-264 (*Gatt* Am. Compl.) ¶¶ 153-163. That did not confer standing on the plaintiff in *Gatt*, and it does not confer standing on plaintiffs here. The fundamental problem in both cases is that a would-be antitrust plaintiff cannot recover lost enterprise value that it never would have had absent its prior participation in the exclusive scheme that it now claims was unlawful.[5]

### 2. Plaintiffs challenge their exclusion from an allegedly anticompetitive arrangement

a. The key question for antitrust injury is what "the plaintiffs [are] really complaining about." *Lamaur*, 787 F.2d at 1202; *see Volvo*,

---

[5]   The district court's further observation that "[t]he harm that flowed from the bid-rigging scheme [in *Gatt*] was artificially inflated prices for the government purchasers" also does not distinguish this case from *Gatt*. S.P.A. 7-8. Plaintiffs here similarly allege that MLB's allegedly unlawful limitation on affiliations results in artificially inflated prices for fans who attend minor league games, not Plaintiffs. J.A. 111 (Pls. Dist. Ct. Br.) at 1 (arguing that restructuring "reduc[ed] output and rais[ed] prices" for "the public"); *see* J.A. 39 (Compl.) ¶ 116 (claiming the restructuring "will [] cause competitive injury to fans, sponsors, and communities"); J.A. 112 (Pls. Dist. Ct. Br.) at 2 (alleging "fewer affiliated games available to fans").

857 F.2d at 67 (asking whether a plaintiff "credibly asserts that it would be better off if it were free to compete"). Here, plaintiffs' basic "theory of injury" is that they lost out on the benefits of their prior participation in MLB's minor league system. *Daniel* v. *American Bd. of Emergency Med.*, 428 F.3d 408, 438 (2d Cir. 2005). At bottom, plaintiffs are challenging their *exclusion* from MLB's minor league system as a result of the 2020 reorganization, not the *existence* of any minor league system with limited affiliations. Several portions of plaintiffs' complaint make clear that they are attacking their exclusion from the very system they now allege to be anticompetitive.

First, plaintiffs' theory of liability turns on their exclusion from the minor league system. Plaintiffs' overriding target in this action is what they call the "Takeover Plan," J.A. 10 (Compl.) ¶ 2—by which plaintiffs mean the move from a six-tier to a four-tier affiliated minor league system. Plaintiffs allege that this "Takeover Plan" "has injured and will continue to injure plaintiffs." J.A. 39 (Compl.) ¶¶ 116-117. Although plaintiffs' complaint says that the reorganization reduced "competition" among MLB clubs for minor league affiliates, it does not mean as compared to a system of unlimited affiliations. Rather, it means as

compared to the pre-2020 six-tier system. *See, e.g.*, J.A. 19-20 (Compl.) ¶ 49 (referring to "the competition among MLB Clubs to have MiLB affiliates" in the six-tier system); J.A. 21 (Compl.) ¶ 53 ("Before the Takeover Plan, MLB Clubs . . . competed with each other to affiliate with up to six MiLB teams."); J.A. 31 (Compl.) ¶ 91 ("[A]ll of that competition has been supplanted by the Takeover Plan.").

Second, plaintiffs' theory of injury turns on their prior participation in the exclusive six-tier system. The Complaint, beginning with its very first paragraph, is full of allegations that attribute plaintiffs' injury to the loss of the affiliations—and associated enterprise value—they had in the prior system. *See* J.A. 9 (Compl.) ¶ 1 ("Stripped of their affiliations . . . Plaintiffs' very existence has been threatened . . . ."); *see also* J.A. 23, 26, 33, 39 (Compl.) ¶¶ 58-59, 68, 70-72, 97, 115, 118. In the "Antitrust Injuries" section of their complaint, plaintiffs allege that the "Plan" "caused each of the plaintiffs' enterprise value to decline precipitously," J.A. 26 (Compl.) ¶ 68, by "stripp[ing]" plaintiffs "of their affiliations," J.A. 26 (Compl.) ¶¶ 70-72. Moreover, in their prayer for relief, plaintiffs seek both damages in the amount of their lost "enterprise values," J.A. 39 (Compl.) ¶ 118, and an injunction ordering MLB to unwind the Takeover

Plan, J.A. 40 (Compl.). In other words, plaintiffs want to be compensated for losing the value they allegedly accumulated because of their participation in the exclusive six-tier system, or to be restored to the positions they occupied in that system.

The district court overlooked plaintiffs' extensive allegations of lost enterprise value and instead characterized their alleged injury as an "inability to compete for affiliations with major league teams." S.P.A. 8. But even if that characterization were accurate, the injury would flow from the alleged group boycott—*i.e.*, the alleged agreement among the 30 major league clubs not to include plaintiffs among the 120 minor league clubs in the current four-tier system—which plaintiffs never sufficiently pleaded and have now effectively abandoned. *See infra*, pp. 54-57. Plaintiffs do not otherwise allege that they were unable to compete for a spot in the current system. Thus, even under the district court's analysis, the only claim that plaintiffs would even arguably have standing to bring alleging a group boycott would be subject to dismissal anyway because of plaintiffs' inability to plead that claim. In any event, plaintiffs are not truly complaining about a lack of competition. They are complaining about losing their exclusive position in the former system.

b.     To be sure, plaintiffs try to speak out of both sides of their mouths.  They say at one point in their complaint that the "Sherman Act requires free-market forces to determine which MiLB teams will [have] big league affiliations."  J.A. 10 (Compl.) ¶ 2.  And in their briefing below, plaintiffs disavowed the pre-2020 system, contending that they "seek unrestrained competition" for affiliations.  J.A. 128.  The district court credited a similar assertion that plaintiffs made in a pre-motion letter.  *See* S.P.A. 6 n.1.  But plaintiffs' attempt to have it both ways runs into several problems.

First, as explained above, plaintiffs' complaint cannot plausibly be read to challenge the existence of a minor league system with limited affiliations.  Plaintiffs benefitted for decades as part of the six-tier system, they claim to be injured by the change from six tiers to four, they want to be compensated for the loss in their minor league clubs' value from the termination of the prior system, and they want to unwind the 2020 reorganization.  In short, plaintiffs are complaining about the end of the pre-2020 system, not the existence of a system in which MLB—like every other professional sports league—limits the number of its minor

league affiliations.  Plaintiffs simply wish that the current minor league system still included them.

Second, plaintiffs try to defend their inconsistency by saying that the pre-2020 PBA "expressly allowed for unlimited affiliations."  Pls. Br. 5; *see* Pls. Br. 1 (stating that in 2020 MLB "cap[ped] minor league affiliations to a fixed number" "for the first time ever").  That is wrong, as plaintiffs' own complaint recognizes.  *See* J.A. 21 (Compl.) ¶ 53 & n.5 (prior system allowed "up to six" minor league affiliates per MLB club, one in each tier).  Article VII(A) of the PBA guaranteed that MLB would maintain "at least" 160 affiliations during the life of the PBA.  But at the same time, the Rules limited MLB clubs to one minor league affiliation per tier, up to a total of six.  J.A. 87-88 (Rule 56(a)).  As the district court observed, "the [prior rules] prevented MLB Clubs from having more than six affiliates."  S.P.A. 3.  That was not a system in which unfettered "free-market forces . . . determine[d] which . . . teams [had] big league affiliations."  J.A. 10 (Compl.) ¶ 2.

Third, even if plaintiffs' complaint could somehow be read to seek an unfettered market for affiliations, plaintiffs have not pleaded any facts about what such a market would look like or why they would still have

affiliations. Plaintiffs allege that "if not for [the challenged] output-reduction agreement," they would "each *still* have their MLB affiliation." J.A. 26 (Compl.) ¶ 69 (emphasis added); *see* J.A. 27 (Compl.) ¶ 75. But the pre-2020 system included a contractual requirement effectively locking in place affiliations for minor league clubs (including plaintiffs), by guaranteeing that a club whose affiliation expired would be granted a new one. *See supra*, p. 8. The fact that plaintiffs were affiliates of major league clubs in that system "shed[s] little light on" whether they would still be affiliated or "how much [they] would earn in a competitive . . . environment." *Gatt*, 711 F.3d at 79. Again, plaintiffs' real complaint—and the only complaint for which they could ever conceivably prove any damage—is the termination of the former exclusive system and the loss of the benefits they enjoyed as a part of that system.

The Ninth Circuit's decision in *City of Oakland* v. *Oakland Raiders*, 20 F.4th 441 (9th Cir. 2021), is instructive here. Oakland challenged the NFL's limitation on the number of teams, and argued that "in the absence of" that horizontal restraint, "it would have retained the Raiders (or acquired another team)." *Id.* at 459. The Ninth Circuit rejected that argument because Oakland had not "plausibly alleged that, but for the

limited number of teams, Oakland would still have an NFL team." *Id.*
"The City ha[d] not alleged—and there [was] no way of knowing—what
would have occurred in a more competitive marketplace." *Id.* The same
is true here. Absent the prior system's protections for existing minor
league clubs, it is "entirely uncertain whether" plaintiffs would have
maintained their MLB affiliations or what their value would have been
if they had. *Gatt*, 711 F.3d at 79. Any asserted loss in plaintiffs' value,
when comparing the current minor league structure to an unrestricted
free market, is "too speculative to establish antitrust standing." *Id.*; *see
City of Oakland*, 20 F.4th at 459; *Todorov*, 921 F.2d at 1454 n.27.

### B. Plaintiffs Have Not Plausibly Alleged A Sherman Act Violation

In addition to lacking antitrust standing, plaintiffs have failed to
state a plausible claim under the Sherman Act. As the district court
recognized, S.P.A. 13, and as plaintiffs now assume, Pls. Br. 11, 13, the
rule of reason controls the analysis. *See North Am. Soccer League, LLC*
v. *United States Soccer Fed'n, Inc.*, 883 F.3d 32, 41 (2d Cir. 2018)
("Regulation of league sports is a textbook example of when the rule of
reason applies."). Plaintiffs therefore must "bear[] the initial burden of
showing that the challenged action has had an *actual* adverse effect on

-46-

competition as a whole in [a] relevant [antitrust] market." *K.M.B. Warehouse Distribs., Inc.* v. *Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995). Plaintiffs cannot make that showing for either of the two agreements they allege.

First, plaintiffs challenge the decision by MLB and its member clubs to reorganize baseball's player-development system by eliminating two minor league tiers, thereby reducing the number of available affiliations. But under the rule of reason, basic structural requirements for the functioning of a sports league, including limits on the number of teams, are not antitrust violations. Other professional sports leagues similarly limit the number of their minor league affiliates. Second, plaintiffs claim that MLB clubs agreed not to affiliate with plaintiffs (or any other minor league clubs that were not selected for affiliations in the reorganized system). There is no evidence, in the real world or in plaintiffs' complaint, of a separate conspiracy by 30 major league clubs to boycott 40 minor league clubs—and plaintiffs have all but abandoned that alternative theory. *See* Pls. Br. 12-14.

### 1. The restructuring of MLB's minor league system did not violate the Sherman Act

a.    Plaintiffs primarily contend that MLB and its member clubs violated Section 1 of the Sherman Act by jointly agreeing to "artificially constrict the number of minor league teams allowed to participate." J.A. 23 (Compl.) ¶ 60. Plaintiffs allege that this "horizontal agreement," J.A. 9 (Compl.) ¶ 1, caused an "artificial reduction in output," J.A. 32 (Compl.) ¶ 96, in the "market for MLB-affiliated MiLB [*i.e.*, minor league] teams," J.A. 21 (Compl.) ¶ 55. *See* J.A. 38 (Compl.) ¶ 111 ("output was reduced from 160 to 120 affiliated teams"). Although plaintiffs dress up these allegations with plenty of antitrust jargon, their contention is ultimately that MLB and its member clubs were forbidden by the Sherman Act to "jointly agree[] to implement a new minor league system," J.A. 23 (Compl.) ¶ 60, organized in four tiers rather than six and thus with 120 affiliated teams rather than a maximum of 180. That position runs counter to basic principles of antitrust law as applied to organized sports.

It is well established that organized sports leagues must agree on the basic rules, such as "the size of the field, the number of players on a team, and the extent to which physical violence is to be encouraged or proscribed." *National Collegiate Athletic Ass'n* v. *Board of Regents of*

*Univ. of Okla.*, 468 U.S. 85, 101 (1984); *see* U.S. Amicus Br. 12 (recognizing this principle). Some of these agreements operate as limitations on output—for example, agreements to "limit[] the number of available players," or the number of regular-season or playoff games. XIII Hovenkamp & Areeda ¶ 2131(b). The "very process of organizing [a league] requires" such agreements. *Id.* They are therefore "essential if the product is to be available at all," and "enable[] a product to be marketed which might otherwise be unavailable." *Board of Regents*, 468 U.S. at 101-102. As a result, such agreements can be declared procompetitive "in the twinkling of an eye." *American Needle, Inc.* v. *National Football League,* 560 U.S. 183, 203 (2010). As the Supreme Court recently reiterated, "a quick look will often be enough to approve the restraints necessary to produce a game" or "create or maintain a league sport." *National Collegiate Athletic Ass'n* v. *Alston*, 141 S. Ct. 2141, 2156-2157 (2021) (citation omitted).

Agreements that limit the number of teams allowed in a sports league are one type of restraint necessary for the league to function. Organized sports leagues "must be able to manage their seasons and organize playoffs, and these things can be accomplished in a workable

-49-

fashion only if the number of participants is limited."  XIII Hovenkamp & Areeda ¶ 2214a; *cf. North Am. Soccer League*, 883 F.3d at 43 (rule requiring a soccer league to have minimum number of teams "benefit[s] the market by coordinating necessary competition").  Put another way, "a decision by [a] league as to the number and identity of its members . . . is a necessary incident of [its] existence as a league."  *State* v. *Milwaukee Braves, Inc.*, 144 N.W.2d 1, 12 (Wis. 1966).  For that reason, it is "clearly not antitrust's job to determine the appropriate size of a sports league," and a "sports league may usually . . . reduce its membership without antitrust condemnation."  XIII Hovenkamp & Areeda ¶ 2214a.  Courts have thus "consistently refused to order sports leagues to expand their membership."  Nathaniel Grow, *Regulating Professional Sports Leagues*, 72 Wash. & Lee L. Rev. 573, 611 (2015).[6]

---

[6]  *See, e.g., Black Bear Sports*, 962 F.3d at 970 (rejecting as "frivolous" skating rink owner's claim that Sherman Act required hockey league to admit new club); *Seattle Totems Hockey Club, Inc.* v. *National Hockey League*, 783 F.2d 1347, 1350 (9th Cir. 1986) (rejecting hockey team's claim that NHL violated Section 1 by refusing it membership); *Mid-South Grizzlies* v. *National Football League*, 720 F.2d 772, 787 (3d Cir. 1983) (rejecting football team's claim that NFL violated Sherman Act by refusing it membership); *Reapers Hockey Ass'n, Inc.* v. *Amateur Hockey Ass'n Ill., Inc.*, 412 F. Supp. 3d 941, 954-956 (N.D. Ill. 2019) (rejecting hockey club's Section 1 challenge to rule limiting amateur hockey league to four teams).

Plaintiffs' claim fails for similar reasons.  Plaintiffs contend that the 30 MLB clubs violated the Sherman Act by limiting the number of clubs that may participate in the affiliated minor leagues.  *See* J.A. 31 (Compl.) ¶ 90.  Plaintiffs assert that "MLB and its Clubs possess absolute control over . . . how many" clubs gain access to those leagues through affiliations, J.A. 32 (Compl.) ¶ 93, and have "collectively decided to artificially reduce the number of such affiliations," J.A. 10 (Compl.) ¶ 2.  Under the antitrust laws, that is no different from complaining that MLB and its clubs "collectively decided to artificially reduce" the number of games in a season, or the number of pitchers allowed on a roster.  While all of these decisions may be "output limiting," they must *necessarily* be made "collectively," and they are *inherently* "artificial" in the sense that they are the product of a league-structuring decision rather than a free-for-all.  And there is "no judicially administrable way of requiring [a league] to accommodate" additional teams, XIII Hovenkamp & Areeda ¶ 2214a, just as there is no judicially administrable way to require a league to play more games, or allow more players onto the roster.  Limiting each major league team to a single affiliation within a given

minor league tier is a natural way to limit both the size of the minor

leagues and the overall roster of prospects or players for each team.

MLB is hardly alone among professional sports leagues in

"dictat[ing] exactly how many affiliations each" of its members may have.

Pls. Br. 2. The two other major North American sports leagues that

feature something like MLB's minor league system—the NHL and

NBA—have long operated under a system in which each major league

club is allowed a limited number of developmental players and has no

more than one affiliate in each minor league tier or its equivalent.[7]

---

[7] In the NHL, every team has one affiliate in the American Hockey League and at most one affiliate in the ECHL. *Team Affiliates*, Nat'l Hockey League, https://records.nhl.com/franchises/team-affiliates (last visited Feb. 27, 2023). Every NHL team may have up to 90 players on its "Reserve List," including developmental prospects assigned to its minor league affiliates. *Collective Bargaining Agreement Between National Hockey League and National Hockey League Players' Association, Sept. 16, 2012–Sept. 15, 2022*, Art. I, https://cdn.nhlpa.com/img/assets/file/NHL_NHLPA_2013_CBA.pdf.

In the NBA, every team has at most one affiliate in the G-League. *What You Need to Know About the NBA G League*, NBA G League, https://gleague.nba.com/about/ (last visited Feb. 27, 2023). G-League teams may have up to 13 players per team. *Frequently Asked Questions: NBA G League*, NBA G League, https://gleague.nba.com/faq (last visited Feb. 27, 2023). NBA teams may assign up to two players on their active roster to the G League at a time. *Id.*; *Collective Bargaining Agreement, Jan. 19, 2017*, Arts. II.11, XXIX.1 and 2, XLI.1, https://cosmic-

---

b. The district court concluded that plaintiffs had plausibly pleaded "reduced competition in the market" for affiliations because of "the current lack of variety concerning the number of minor league affiliates for each club." S.P.A. 15. That is, because a four-tier system with a one-to-one correspondence between the major leagues and minor leagues caps the number of affiliations, the court believed that plaintiffs had sufficiently pleaded an anticompetitive restraint. But the court did not take account of the unique circumstances of sports leagues, or consider the implications of treating a reduction in minor league tiers as anticompetitive. Under the court's approach (and plaintiffs'), the antitrust laws either forbid sports leagues from limiting the number of teams or the size of their rosters, or they create a one-way ratchet: leagues and teams may expand, but never contract. Antitrust exemption or not, no court has ever taken that view of antitrust's application to league sports.

---

s3.imgix.net/3c7a0a50-8e11-11e9-875d-3d44e94ae33f-2017-NBA-NBPA-Collective-Bargaining-Agreement.pdf.

### 2. Plaintiffs have not plausibly alleged a group-boycott conspiracy

Plaintiffs have all but abandoned their alternative theory of a group boycott among the 30 MLB clubs—*i.e.*, an agreement among the MLB clubs that none of them would give any of plaintiffs one of the 120 spots in the new player-development system. *See* Pls. Br. 12-14. To the extent plaintiffs are still pursuing that theory, their group-boycott allegations fall far short of their pleading burden.

To survive a motion to dismiss, a Section 1 plaintiff must "allege enough facts to support the inference that a conspiracy actually existed." *Mayor & City Council of Balt.* v. *Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). A "conclusory allegation of agreement" is not enough, because "[t]he ultimate existence of an 'agreement' . . . is a legal conclusion, not a factual allegation." *Id.* at 135-136. As relevant here, because "conduct resulting solely from competitors' independent business decisions" is not unlawful, "[p]arallel action is not, by itself, sufficient to prove the existence of a conspiracy." *United States* v. *Apple, Inc.*, 791 F.3d 290, 315, 318 (2d Cir. 2015). "[S]uch behavior could be the result of coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the

-54-

parties." *Id.* at 315 (internal quotation marks omitted). Accordingly, a plaintiff must allege "plus factors," *i.e.*, circumstances that, "when combined with parallel behavior, might permit a jury to infer the existence of an agreement." *Citigroup*, 709 F.3d at 136 n.6.

Here, plaintiffs offered mere conclusory allegations of a group boycott. *See*, *e.g.*, J.A. 9, 13, 23, 24, 27, 30, 38 (Compl.) ¶¶ 1, 8, 58, 60, 62, 75, 87, 111. Plaintiffs pleaded no "direct evidence"—such as "a recorded phone call," *Citigroup*, 709 F.3d at 136—of any agreement among major league clubs to boycott specific minor league teams. Instead, their group-boycott claim rests on two pieces of circumstantial evidence: (1) none of the MLB clubs selected plaintiffs as affiliates, and (2) some MLB clubs chose to remain affiliated with teams "that were owned by or closely connected to MLB or its Clubs, regardless of their comparative quality." J.A. 33 (Compl.) ¶ 97; *see* J.A. 24-25 (Compl.) ¶¶ 62-67.

Those allegations do not come close to "invest[ing] the action[s] . . . alleged with a plausible suggestion of conspiracy." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 566 (2007). First, plaintiffs do not allege parallel conduct in the relevant sense—*i.e.*, conduct that raises some inference of

a hidden or tacit agreement. That 40 teams, including plaintiffs, ended up unaffiliated was the logical consequence of the agreement among MLB clubs to reduce the minor leagues from six tiers to four; it does not suggest a conspiracy to penalize the particular unaffiliated clubs. Second, plaintiffs lack any "plus factor" to show an anticompetitive agreement. They emphasize that some of the minor league teams that remained affiliated are "owned by or closely connected to MLB or its Clubs." J.A. 33 (Compl.) ¶ 97. But that is precisely the sort of outcome "that could just as well be" the result of "independent action." *Twombly*, 550 U.S. at 557. If anything, the fact that certain MLB clubs kept their affiliations with teams connected to a member of their ownership group, J.A. 25 (Compl.) ¶¶ 65-66, suggests that *individualized* personal or business interests—not league-wide coordination—drove affiliation decisions.

\* \* \*

The parties agree that this Court should affirm the district court's dismissal under the antitrust exemption for the business of baseball. But the district court did not stop there, and neither should this Court. Rather than leave the decision below on the books to cause future mischief, the Court should correct the district court's errors in assessing

antitrust injury and anticompetitive conduct, and affirm the dismissal of this suit on those alternative grounds as well.

## CONCLUSION

For the foregoing reasons, this Court should affirm the decision of the district court.

Dated: February 27, 2023    Respectfully submitted,

/s/ John L. Hardiman

JEFFREY B. WALL      JOHN L. HARDIMAN
MORGAN L. RATNER     BENJAMIN R. WALKER
SULLIVAN & CROMWELL LLP  JACOB G. SINGER
1700 New York Avenue, N.W.,  SULLIVAN & CROMWELL LLP
Suite 700         125 Broad Street
Washington, D.C. 20006    New York, New York 10004
(202) 956-7500       (212) 558-4000
wallj@sullcrom.com      hardimanj@sullcrom.com
ratnerm@sullcrom.com     walkerb@sullcrom.com
              singerja@sullcrom.com

*Counsel to Defendant-Appellee The Office of the Commissioner of Baseball, an Unincorporated Association d/b/a Major League Baseball*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) and Local Rule 32.1(a)(4) because this brief contains 11,787 words, excluding the parts of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

I further certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 32(a) because this brief has been prepared in 14-point font in a proportionally spaced typeface using Microsoft Word 2016.

Dated:       February 27, 2023

/s/ John L. Hardiman
John L. Hardiman

*Counsel to Defendant-Appellee The Office of the Commissioner of Baseball, an Unincorporated Association d/b/a Major League Baseball*

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2023, the foregoing brief was filed with the Clerk of the Court using the Court's CM/ECF system.  I further certify that all parties required to be served have been served.

Dated:      February 27, 2023

/s/ John L. Hardiman
John L. Hardiman

*Counsel to Defendant-Appellee The Office of the Commissioner of Baseball, an Unincorporated Association d/b/a Major League Baseball*